593 So.2d 833 (1992)
STATE of Louisiana
v.
Clarence J. GOVAN and Patrick D. Govan.
No. 89-KA-1727.
Court of Appeal of Louisiana, Fourth Circuit.
January 16, 1992.
Harry F. Connick, Dist. Atty., Pamela S. Moran, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
M. Craig Colwart, Orleans Indigent Defender Program, New Orleans, for defendants/appellants.
Before SCHOTT, C.J., and LOBRANO and WILLIAMS, JJ.[*]
SCHOTT, Chief Judge.
Defendants were convicted of second degree murder in violation of R.S. 14:30.1 and were each sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. A review of the record for errors patent reveals none.
*834 On May 31, 1988, defendants called the police and reported a possible burglary of their home and the murder of their uncle Lucius Warner. When officers arrived on the scene, they found Warner's body lying on the floor of the dining room. His wrists and feet had been bound with red shoestrings, and he had sustained visible injuries including bruises and scrapes to his scalp, face, back of neck, shoulders, hips, and wrist. An autopsy revealed serious bodily injuries including a ruptured spleen which could have been caused by a blow to the back and bruises to the brain caused by the intensity of injuries to the head. There were also marks on Warner's neck consistent with someone placing their hands around the neck. However, the Coroner determined the legal cause of death to be death by asphyxiation within five to ten minutes after a gag had been placed inside the victim's mouth.
Three people were implicated in the murder and arrested: Defendants Clarence J. Govan and Patrick D. Govan and Jarman Webb. The Govan brothers admitted tying-up Warner as a joke. Patrick testified that they had planned to tie him up, strip him, and place him outside in front of the house in order to humiliate him for making suggestive remarks to their friends and for making a pass at Webb.
Patrick admitted that he enlisted Webb's help and that after midnight he, Clarence and Webb pulled the fuses and entered the house. Warner woke and tried to escape through the front door but was stopped by Webb and it sounded as if Webb were hitting Warner. The trio held Warner down and Patrick tied his legs and arms. During this time, Patrick heard noises which sounded like someone was being beaten, and he admitted that he elbowed Warner in the back in an attempt to subdue him while binding him. He testified that it was Webb's idea to gag Warner and that Webb used a shirt to do so. After tying up Warner, the three went to the back room where Warner had indicated his money was located. They messed up the room to create the appearance of a burglary and fled leaving the door unlocked. Warner was allegedly still breathing. When he and Clarence returned to the house several hours later, the front door was locked so they entered through a window. When they found their uncle dead, they made up the story about the possible burglary in order to mask their involvement. Before police arrived, Patrick took off his bloodstained jeans and put them in the wash, he threw the fuse box pad locks into a storm drain and called his girlfriend to try to set up an alibi. He insisted that they did not intend to hurt Warner, but only wanted to frighten him.
Clarence testified similarly indicating that Patrick and Webb approached him on the evening of the murder and told him that they wanted to play a joke on Warner by breaking into the house to tie him up and returning later to rescue him. Clarence testified the original plan did not include hitting Warner, and that Webb was the first to hit Warner. Clarence admitted that he hit Warner eight or nine times in the abdomen while Patrick tied him and Webb gagged him, but he insisted that he did not hit Warner hard. He denied hitting Warren in the head and said that Webb did. He testified that it was Patrick's idea to gag Warner; and that Warner continued to scream until Webb put the gag into his mouth; that Webb used a tee shirt to do so. Before leaving, he put the back room in disarray to make it look like a burglary had occurred. When they returned to the house in the early morning, Warner had evidently moved from where they had left him indicating that Warner was alive when they left. Before calling the police, he cut the laces binding Warner's legs and wrists.
Jarman Webb pled guilty to a reduced charge of manslaughter in exchange for his testimony. He testified that he told the Govan brothers that Warner had made a suggestive remark to him. He agreed to help Patrick play a joke on Warner and they enlisted Clarence's help. He did not know of the details of the plan until they were inside the house. Once inside the house, they all subdued Warner but Clarence and Patrick hit Warner as they tied him up. At one point Warner asked if one of the assailants was "Junior", a name *835 used by Clarence. Patrick instructed him to gag Warner, but he claims that he did not stuff anything into Warner's mouth. He admitted that he hit Warner about five times at Patrick's insistence but that he did not try to hurt or kill Warner. He said that both defendants continued to beat and kick Warner for about fifteen minutes and that Warner was struggling and crying out for help during the attack.
Defendants' sole assignment of error is that the evidence is insufficient to show they specifically intended to kill or inflict great bodily harm upon their uncle. R.S. 14:30.1. "It is not essential that the act of defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient." State v. Matthews, 450 So.2d 644, 646 (La.1984). Specific criminal intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the finder of fact. State v. Rayford, 476 So.2d 961, 964 (La.App. 1st Cir.1985).
The objective evidence supports the jury verdict that defendants specifically intended to inflict great bodily harm and that their conduct was clearly a contributing cause of death. Asked the cause of Warner's death, the coroner stated that "[h]e died of multiple injuries among which were injuries to his mouth, indicating that he had something in his mouth obstructing his airway. His lungs were unexpended. He had many bruises and scrape marks of the skin over his scalp, over his face, over his shoulders and his hips, the back of his neck, right wrist, and he had bruises of his brain due to the intensity of the injuries to the head." Warner also suffered a ruptured spleen caused by blows to his back. Although asphyxiation was the legal cause of Warner's death, the coroner opined that Warner's bruised brain and ruptured spleen constituted evidence of serious bodily harm. He said that asphyxiation was the result of something, some form of material, having been roughly stuffed into his mouth preventing him from breathing.
Defendants' statements and testimony indicate that Webb inflicted the blows to Warner's head as he was the person closest to Warner's head and as he was the person who gagged him. Blows to the back caused the ruptured spleen and Patrick admitted that he repeatedly punched Warner in the back. The evidence also shows that Clarence hit Warner many times in the abdomen. No one admitted to removing the gag before leaving Warner, and it is implausible that Warner was able to pull a gag from his mouth with his hands tied behind his back. Each man testified in such a way to make it appear that he was less culpable than the others. The two defendants tried to make Webb the leader in the beating and the one who stuffed the gag into Warner's mouth while Webb tried to show that the defendants were giving the orders and he was afraid to do otherwise. The jury's function was to evaluate this testimony. They apparently concluded that the three jointly contributed to Warner's death and everything that led up to it. It is not the function of an appellate court to make independent credibility determinations. Only by accepting as true all of the defendants' testimony could this court conclude that they did not intend to inflict great bodily harm on Warner. This would be a distortion of the appellate process. Proper appellate review dictates that defendants' testimony be viewed in the light most favorable to the prosecution. Doing so we find their testimony to be self serving and contrived to avoid responsibility for their actions.
The three men acted in concert in gang beating Warner for approximately fifteen minutes, leaving Warner bound and gagged and unable to help himself. All persons concerned in the commission of the crime, those who aid an abet in its commission or who directly or indirectly cause another to commit the crime are principals. R.S. 14:24. Consequently, each of these three who jointly participated in the beating *836 and of the gagging is criminally responsible for each aspect of the beating and gagging whether he personally administered it or not. From the extent and severity of the injuries sustained by Warner, it is impossible to interpret defendants' actions in any manner other than that they were intended to inflict great bodily harm upon Warner; and defendants' actions were a substantial factor in bringing about Warner's death. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of second degree murder. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (La. 1987).
Defendants argue that the evidence only supports a verdict of manslaughter. There are two types of manslaughter: one committed in the heat of passion and another committed during the perpetration or attempted perpetration of certain felonies and misdemeanors, or resisting lawful arrest. R.S. 14:31. Provocation may reduce a homicide to manslaughter if the offense is committed in sudden passion immediately caused by provocation sufficient to deprive an average person of his control and cool reflection. Provocation is a question of fact for the jury to determine whether defendants' conduct cooled or whether the average person's blood would have cooled. State v. Rayford, 476 So.2d 961, 964 (La. App. 1st Cir.1985). Evidence clearly supports a finding that the defendants did not act in sudden passion due to immediate provocation.
Accordingly, defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[*] Due to the retirement of Judge David R.M. Williams prior to rendition, but after his concurrence therein, this opinion is rendered unanimously by Judges Schott and Lobrano).