664 So.2d 1315 (1995)
STATE of Louisiana
v.
Kevin FENNER.
No. 94-KA-1498.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1995.
*1316 Harry Connick, District Attorney, Susan M. Erlanger, Assistant District Attorney, Stacie Smith, Law Clerk, New Orleans, for State.
Frank G. Desalvo, Edward K. Newman, New Orleans, and Stephanie Hrachovy, Metairie, for defendant.
Before BARRY, BYRNES, and WALTZER, JJ.
BYRNES, Judge.
Kevin Fenner appeals his conviction and suspended three-year sentence for negligent homicide. We reverse.
On October 5, 1992 at approximately 6:00 p.m., the defendant, Kevin Fenner, a New Orleans police officer, was dispatched with his partner, Officer Joel Tallant, to Stemway *1317 Drive and Warfield Street to investigate a report that a possibly armed young black male named "Virgil" was selling drugs. The officers exited their patrol car and ordered Virgil Braud[1] and Lloyd Esteen, who were standing on the corner, to approach the vehicle. The defendant frisked Virgil and found a black film canister containing crack cocaine and marijuana. As the defendant attempted to place Braud under arrest, he began to struggle.
Officer Tallant went to assist the defendant by holding Braud's arms behind his back, but Officer Tallant was unable to fully subdue Braud. Defendant radioed for assistance, and he grabbed Officer Tallant's "asp", a collapsible billy club, and struck Braud with it. Braud managed to grab one end of the asp, and he and defendant briefly struggled for it until it was wrested from Braud's grasp.
Braud and Officer Tallant continued to wrestle over the back of the police car until both men fell and rolled around on the ground. The testimony of the witnesses conflicts as to when the defendant pulled his gun and shot Braud. According to the prosecution witnesses, Braud either broke free from Officer Tallant or was in the process of doing so when he was shot by the defendant. According to defendant and Officer Tallant, Braud was trying to remove Officer Tallant's gun from the holster when defendant shot Braud. The bullet entered the right side of Braud's chest and perforated the aorta, causing massive internal bleeding and Braud's death. Dr. Paul McGarry, the forensic pathologist who performed the autopsy, testified that the bullet entered the body of Virgil Braud at a slight downward angle and agreed that one possibility was that it was consistent with someone coming from the ground or in a crouched or moving position. He stated that there were many possibilities and he simply indicated the angle of entry into the skin.
After a judge trial on November 18, 1993, the trial court found the defendant guilty of negligent homicide in violation of La.R.S. 14:32. On February 23, 1994, the defendant was sentenced to a three-year suspended sentence at hard labor with two years active probation. Defendant was ordered to pay court costs of $167.50 or serve 30 days in parish prison in default of the payment, and to pay $20 each month to the Department of Corrections. Defendant's appeal followed.
On appeal the defendant contends that the trial court's verdict was contrary to the law and evidence based on the claims that the State failed to prove the essential element of negligence; the State did not meet its affirmative burden of disproving the defendant's claim of self-defense; and the contradictory nature of the witnesses' testimony rendered a conviction insupportable. The defendant also argues that the trial court erred in excluding evidence of the decedent's violent character.

Errors Patent
A review of the record reveals an error patent in that defendant's sentence is not fully set forth in the minute entry which states that imposition of sentence was suspended and that defendant was placed on two years active probation. The minute entry fails to set forth the length of the suspended sentence. The appeal record was later supplemented with the sentencing transcript, and that transcript shows that defendant was given a three year suspended sentence. When there is a conflict between the minute entry and the sentencing transcript, the transcript controls. State v. Lordi, 543 So.2d 599 (La.App. 4th Cir.1989).

SUFFICIENCY OF EVIDENCE
Defendant argues that the trial court's verdict was contrary to the law and the evidence. The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential *1318 elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La. 1986). The reviewing court is to consider the record as a whole and not just evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). However, if the appellate court finds that no rational trier of fact viewing all the evidence from a pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot constitutionally stand. Id.
To convict a person of negligent homicide, the State must prove beyond a reasonable doubt that the defendant was criminally negligent and that a killing resulted from this misconduct. La.R.S. 14:32; State v. Taylor, 585 So.2d 655 (La.App. 4th Cir.1991), writ denied 590 So.2d 78 (La.1991).
Although neither specific nor general intent is present, criminal negligence exists when there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La.R.S. 14:12. Unlike specific or general intent, criminal negligence is found from the defendant's gross disregard for the consequences of his actions. State v. Martin, 539 So.2d 1235 (La.1989); State v. Wilcoxon, 26, 126 (La.App. 2d Cir., 6/22/94), 639 So.2d 385, writ denied, 94-1961 (La. 12/16/94), 648 So.2d 386.

CRIMINAL NEGLIGENCE & CRIMINAL INTENT
The defendant argues that the state failed to prove criminal negligence because "virtually all of the testimony, including the appellant's, points to the appellant's actions being intentional.... Criminal negligence cannot exist unless there is `neither specific nor general criminal intent.' State v. Adams, 210 La. 782, 28 So.2d 269, 270 (1946), quoting La.R.S. 14:12." See also State v. Beason, 26,725 (La.App. 2d Cir. 4/7/95), 653 So.2d 1274.
We recognize that La.C.Cr.P. art. 814 does not list negligent homicide as a responsive verdict to murder or manslaughter charges from which it might be inferred that negligence and intent have no relationship. We also recognize that our Supreme Court recently decided that a negligent landlord could not have her percentage of fault reduced by the fault of an intentional rapist who raped a tenant. Veazey v. Elmwood Plantation Associates, 93-2818 (La. 11/30/94), 650 So.2d 712.
First, La.C.Cr.P. art. 814 does not apply to this case because the verdict of negligent homicide rendered against the defendant was not rendered as a responsive verdict to charges of murder or manslaughter. La. C.Cr.P. art. 814 applies only to responsive verdicts. Official Revision Comment (c) under La.C.Cr.P. 814 shows that responsive verdicts in addition to those enumerated in Article 814 are possible where the lesser included offense is of the same genus (homicide) as the crime charged in the indictment. Therefore, pursuant to the Louisiana Supreme Court's logic as expressed in footnote 4 of State v. Tompkins, 403 So.2d 644, 648 (La.1981), a higher level of criminal intent cannot be a defense to a charge of negligent homicide:
Moreover, R.S. 14:5 provides that "[a]n offender who commits an offense which includes all the elements of other lesser offenses, may be ... convicted of one of the lesser and included offenses". The redactors' comment states that "it should never be a defense for an offender to assert that an added criminal element was present, making him guilty of a more serious crime." Any contention by defendant that evidence of a "cold blooded" killing can be a defense to manslaughter, because he is guilty of the more serious crime of second degree *1319 murder (which was then defined as a killing in which the offender acted with a specific intent to kill or inflict great bodily harm), seems contrary to the redactors's intent. See State v. Malmay, [209 La. 476] 24 So.2d 869 (La.1946), in which this court rejected defendant's contention that his negligent homicide conviction must be set aside because the evidence showed that he intentionally struck the victim with a fatal blow. [Emphasis added.]
The Supreme Court went on to explain that the logic of its reasoning as set forth in footnote 4 expressly applies to negligent homicide:
Negligent homicide is a lesser grade of the offense of manslaughter, even though it is not legislatively responsive. C.Cr.P. art. 814 does not list negligent homicide as a verdict responsive to manslaughter, but prior to the enactment of C.Cr.P. art 814 (and its predecessor R.S. 15:386) negligent homicide was held to be a responsive, lesser grade of the offenses of murder and manslaughter. See R.S. 14:5, official revision comment; State v. Stanford, [204 La. 439] 15 So.2d 817 (La.1943).
State v. Tompkins, 403 So.2d 644, 649 (La. 1981), fn 7.
Second, if the tenant-victim in Veazey had sued the rapist alleging that she was injured as a result of the negligence of the rapist, we do not believe that the Supreme Court would have allowed the rapist to defeat the claim with a defense that a finding of intent negates a finding of negligence. The rapist in Veazey was not a party to the suit. Simply put, it is inconceivable that the Supreme Court in Veazey intended to afford a defense to those charged with negligent homicide. From the State's perspective, if all a defendant had to do to defeat a charge of negligent homicide or any other form of criminal negligence would be to convince a jury that he intended the act, the whole purpose of such laws will be too easily subverted. From a defendant's perspective, there is no prejudice to the right to know the nature of the charges against you. No reasonable defendant realistically expects to exonerate himself from the consequences of his or her acts by claiming that they were intentional rather than accidental. Even a small child who has just broken a valuable vase and is being admonished by an angry parent to be more careful knows that it is no defense to respond that he broke the vase deliberately. To the same effect see the Reporter's Comment under La.R.S. 14:5, which states in pertinent part:
... Then too it should never be a defense to an offender to assert that an added element was present, making him guilty of a more serious crime.
Fenner's argument is reminiscent of the old legal saw about the defendant who killed both of his parents and then asked for mercy because he was an orphan.[2]
A defendant may not defend against a charge of negligent homicide by asserting that he intended to shoot the victim, and therefore was not negligent.

JUSTIFIABLE HOMICIDE
Under La.R.S. 14:20(1), a homicide is justifiable if committed by one in defense of himself when he reasonably believes he is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save himself from danger. Under La.R.S. 14:22, homicide is justifiable in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself and when it is reasonably believed that such intervention is necessary to protect the *1320 other person. When self-defense or the defense of another is claimed by the defendant, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense or in defense of another. State v. Lynch, 436 So.2d 567 (La.1983); State v. Matthews, 468 So.2d 1333 (La.App. 1st Cir.1985).
The testimony of the witnesses conflicted as to contested facts, and in particular, to the crucial timing of the fatal shot. Because the witnesses' testimony contained multiple contradictions, the State failed to show beyond a reasonable doubt that the defendant did not act in defense of another officer or that the defendant was negligent.
Clarence Moten testified that he saw the incident from a parked car which was approximately 25-30 feet facing away from the police car. Moten turned around in his seat to observe what was happening. He stated that he saw the defendant and Braud holding one end of the policeman's baton while Officer Tallant attempted to hold Braud from the rear. Moten related that the defendant first drew his gun while the defendant and Braud struggled for the baton, when the defendant pointed the gun at Braud's head and then his groin.
It is not clear from the conflicting testimony of the witnesses at what point during the altercation the gun went off. Karen Coffil saw the incident while standing at the front of the police car. She testified that the defendant first drew his gun when Braud was bent over the police car and pointed it at a man who came out of a trailer parked at the scene. Coffil related that the defendant told the man to stay back or he would blow his brains out, and then the defendant pointed the gun at Braud as they struggled. Coffil did not state that the defendant pointed the gun to Braud's head and then to his groin. Although Coffil stated that one of the officers hit Braud on the top of the head with a billy or police baton several times, Moten did not see either officer hit Braud with the baton.
Roderick Dangerfield related that when he was coming out of the trailer parked directly behind Sam's Meat Market, Braud was being frisked by Officer Tallant, not by the defendant as stated by other witnesses. Dangerfield testified that neither officer searched Lloyd Esteen although other witnesses testified that Officer Tallant searched Esteen. Dangerfield stated that the defendant first pulled the gun and pointed at Braud's head after Dangerfield left the trailer at the time of the struggle over the baton. Then Dangerfield testified that the defendant pointed the gun at him.
Basim Barakat, owner of Sam's Meat Market, related that he saw the incident from in front of the market on the same side of the street as the parked patrol car. He testified that the defendant drew his gun and fired after the struggle over the baton had ended when Officer Tallant was on the ground struggling with Braud when Braud attempted to rise with Officer Tallant hanging to him.
Jamoll Bland stated that he saw the defendant draw his gun but could not state when or how long before the defendant fired.
The defendant and Officer Tallant testified that the defendant drew his gun when Braud attempted to draw out Officer Tallant's gun during the struggle.
The witnesses also did not agree upon how far the defendant was from Braud when the defendant fired the shot.
Moten stated that Braud freed himself from the struggle and was moving away when the defendant shot Braud ten to twelve feet from the defendant. Moten agreed that he could not see the whole view of when Braud was actually hit because he had to turn around in the seat of the car to view the incident. He related that he was looking at the defendant when the shot was fired, and he only looked toward Braud after he heard the fired shot. After Moten saw the defendant fire the shot, he turned around in the other direction to see Braud.
Coffil testified that Braud was three or four feet away from both the defendant and Tallant when the defendant fired the shot. *1321 Although she stated that Braud was free from Officer Tallant when the shot was fired, she later related that she did not know if Officer Tallant was struggling with Braud when the shot was fired. She agreed that she may have told the police on the night of the incident that Officer Tallant was struggling with Braud at the time the shot was fired.
Lloyd Esteen testified that Braud was not struggling with Officer Tallant when the shot was fired but was three feet away. Later he agreed that he could not tell if Officer Tallant and Braud were struggling at the time of the shot.
Xavier Banks claimed that the defendant was nine feet away and Officer Tallant was three feet away from Braud when the shot was fired. He later agreed that he could not tell if Officer Tallant and Braud were struggling at the time of the shot.
Mr. Barakat could not tell if Officer Tallant and Braud were in physical contact at the time of the shot or whether Braud reached for Officer Tallant's gun.
Jamoll Bland testified that he could not see if Braud reached for Officer Tallant's gun. Although Bland testified that Braud broke free from Officer Tallant when he was shot, according to his statement to the police on the night of the incident, Bland turned away when he saw the gun and Bland did not see what happened when it was fired.
Roderick Dangerfield testified that Braud was not free from Officer Tallant when the shot was fired, but Braud was struggling with Officer Tallant.
Other inconsistencies were present in the witnesses' testimony. Esteen and Banks testified that they had been standing with Braud when the Officers Tallant and Fenner arrived, and Braud did not appear to be intoxicated. The coroner reported that Braud's blood alcohol level was .18.
The witnesses' declarations varied with respect to the black canister. Esteen testified that he first saw the canister in the defendant's hands, and the defendant only removed Braud's wallet during the pat down. However, Esteen gave a statement to the police that he saw the defendant remove a wallet and black canister, and he believed drugs were found in the canister.
Banks and Bland could not state what they saw, if anything was removed from Braud.
Dangerfield stated that the canister was not produced until after the shooting when the defendant exclaimed, "we've got him now," although no one else testified that the exclamation was heard.
Only Dangerfield stated that the defendant closed the asp or baton and replaced it in his belt. Only Banks testified that the defendant shouted to Braud, "Virgil, I'm a shoot you, I'm a shoot you" while Officer Tallant and Braud struggled on the ground.
Although Banks testified that he did not see the defendant try to handcuff his cousin Braud, in his statement to the police, Banks related that the defendant grabbed Braud and was trying to handcuff him.
Barakat stated that Braud did not grab the police stick when the defendant hit him with the billy although other witnesses stated that Braud's hands were on the stick.
Although Reserve Deputy Darrell Thompson testified that he and Sergeant Ronald Johnson heard the gunshot while driving up, and they were the first to arrive on the scene together after the shooting, Dangerfield testified that only one officer arrived. While Braud was on the ground, Dangerfield stated that the one additional officer took Tallant's handcuffs, cuffed Braud and pushed him back on the ground. Deputy Thompson testified that he handcuffed Braud who was trying to sit up. When Deputy Thompson noticed that Braud started bleeding when he attempted to sit up, Thompson testified that he held pressure on the wound so Braud would not bleed. Meanwhile, Sergeant Johnson called for an ambulance.
Because of the many variations and conflicting testimony of the witnesses, no rational *1322 trier of fact could find that the defendant did not act in defense of another, and that the defendant's conduct was in such disregard to others that it amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances to constitute negligent homicide. When the defendant tried to assist in apprehending an individual who was so intoxicated that he had a blood alcohol level of .18, almost twice the legal alcohol consumption limit, under these circumstances, the defendant could not take the chance to endanger the life of himself or his partner. Based on the numerous inconsistencies, the State failed to show that the defendant was not doing his job and was not acting defensibly to protect the life of Officer Tallant under the totality of circumstances.

Proffered Testimony
A reversal of defendant's conviction precludes a review of the issue of whether the proffered evidence of Braud's violent character was admissible.
Accordingly, the defendant's conviction and sentence are reversed.
REVERSED
WALTZER, J., concurs with reasons.
WALTZER, Judge, concurring with reasons.
I respectfully concur in the majority's decision to reverse and thus, to acquit the defendant. My reasons for this decision are based solely on the lack of proof that this homicide was not committed in self-defense and/or defense of others. Furthermore, I consider it imperative that specific legal concepts be addressed in detail.
Defendant assigned various errors, inter alia that the State failed to prove the essential element of the crime charged, i.e. criminal negligence, and, that the State failed to meet its burden of disproving the defendant's claim of self-defense.[1]

THE STATE FAILED TO PROVE AN ESSENTIAL ELEMENT OF THE CRIME CHARGED, I.E. CRIMINAL NEGLIGENCE.
The defendant is charged with the crime of negligent homicide. LSA-R.S. 14:32 provides:
A. Negligent homicide is the killing of a human being by criminal negligence * * *
LSA-R.S. 14:12 provides that criminal negligence exists when "although neither specific nor general intent is present, there is such a disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonable man under like circumstances". (Emphasis added.) Appellant claims that all his activities were intentional, hence the State did not prove negligence and, therefore, his conviction should be overturned.
Appellant testified that he acted in defense of self and in defense of his partner. His testimony belies inadvertence, the defense argues, and, therefore reversal is mandated. The defense argues that since criminal negligence cannot coexist with either specific or general criminal intent, and the facts proved specific criminal intent, the verdict was contrary to the law and the evidence. Principally, the defense cites State v. Adams, 210 La. 782, 28 So.2d 269 (1946) for that proposition.
The appellant's reliance on Adams is misplaced. As appealing as that holding might be, it does not fit the facts of this case. In Adams, the charge was attempted murder, and the jury returned a verdict of attempted negligent homicide. An attempt, by definition, is an intentional crime requiring specific intent. The fact finder returned a verdict in Adams that was not responsive to the charge and, in fact, did not exist at law. Because attempted negligent homicide was not a legal *1323 verdict, the defendant in Adams was acquitted. The overly broad statement in Adams that it is impossible for a person to be guilty of negligent homicide unless there is neither specific nor general criminal intent to commit the homicide, is simply wrong when applied to the case under consideration. Read out of context, it appears to say that whenever criminal intent is proven, that proof is an absolute defense to the crime of negligent homicide. The verdict of attempted negligent homicide returned in the Adams case was simply illegal because no such crime existed in the law. Adams does not stand for the proposition that a defendant must be acquitted in a negligent homicide prosecution because he acted wilfully.
Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the offender actively desires the prescribed criminal consequences to follow his act or failure to act; intent may be inferred from the circumstances, and the presence or absence of specific intent is ultimately to be resolved by the finder of fact. State v. Govan, 593 So.2d 833 (La.App. 4 Cir.1992), writ denied 600 So.2d 654 (La. 1992).
General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. LSA-R.S. 14:10(1) and (2). These two types of intent are defined by the accused's mindset and criminal conduct. Criminal conduct consists of:
1) An act or failure to act that produces criminal consequences, and which is combined with criminal intent; or
2) A mere act or failure to act that produces criminal consequences, where there is no requirement of criminal intent; or
3) Criminal negligence that produces criminal consequences. LSA-R.S. 14:8.
There is confusion between the first category of criminal conduct, which requires intent plus an act or failure to act, and the third category, which requires violation of the reasonable man standard that produces criminal consequences. In a negligent homicide case we do not speak of a mindset as an ingredient of the criminal act or criminal consequences. Rather, we use "criminal negligence" to define BEHAVIOR that amounts to a deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances, and which produces criminal consequences. For example, first and second degree murder charges require proof beyond a reasonable doubt of specific intent to kill or cause serious bodily harm. The term "criminal negligence" can be seen as an oxymoron, because we speak of subjective awareness when we define the negligent act as performed "wilfully", "recklessly", "grossly" and in "disregard of the interest of others", while denominating the act "negligence". Moreover, these adverbs indicate an awareness which comes close to, but is not equal to, INTENT.
The negligent homicide statute proscribes recklessness that goes beyond simple negligencemore than a merely unreasonable risk. Criminal negligence corresponds closely to the concept of "gross negligence" in tort law. Reporter's Comment to LSA-R.S. 14:12; see also, Restatement of the Law of Torts (1934) Sects. 282-284, 500.
The State is required to show more than a mere deviation from the standard of ordinary care to establish proof of criminal negligence. State v. Jones, 298 So.2d 774 (La.1974). Criminal negligence is found in an accused's gross disregard for the consequences of his actions rather than in his intent to cause some consequences of his actions. State v. Rock, 571 So.2d 908 (La.App. 5 Cir.1990), writ denied 577 So.2d 49 (La.1991). "Gross disregard" exists when the actor KNOWS or has reason to KNOW facts which create a high risk of physical harm to another, yet DELIBERATELY proceeds to act in total disregard to that risk. Another type of "gross disregard" exists when the actor has KNOWLEDGE, or has reason to KNOW, but does not realize or appreciate the high *1324 degree of risk involved, although a reasonable man in his position would do so. For either type of conduct, the actor MUST KNOW, or have reason to KNOW the facts which create the risk. The use of the words KNOW and KNOWLEDGE in this context does not equate with SPECIFIC or GENERAL CRIMINAL intent, as defined by our Code, but implies a CONSCIOUS DISREGARD for the safety of another and a WILLINGNESS (not intention) to take a known chance of injuring another.
Negligent homicide is not a responsive verdict to first degree murder, second degree murder or manslaughter.[2] To a charge of Negligent Homicide the only responsive verdicts are guilty and not guilty. C.Cr.P. art. 814(A)(7). The codal scheme of "lesser included offenses" (or the absence thereof as it pertains to negligent homicide) convinces me that the legislature fully intended to proscribe conduct which is ordinarily a tort, but which becomes a crime because it is exceedingly wanton and produces harmful consequences. This category of torts are found in civil law and are those warranting additional damages over and above compensatory recovery when the defendant exhibits "wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances"; La.C.C. art. 2315.3, or when it is proven that the plaintiff is injured because of "wanton or reckless disregard" for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was the cause in fact of the resulting injuries. La.C.C. art. 2315.4. The next steps up the chain are negligent homicide and vehicular homicide, hybrids between torts which are deserving of punitive damages and crimes requiring an element of wilfulness. Remarkably, though, whether a tort or a hybrid, the reasonable man standard provides the measuring stick to be used by the fact finder.
Jury charges used in negligent homicide cases best illustrate the hybrid nature of a negligent homicide case. Although it is error to charge a jury with a definition of criminal intent, as it is not a required element of the crime charged, State v. Douget, 507 So.2d 283 (La.App. 3 Cir.1987), writ denied 513 So.2d 288 (La.1987), there is sufficient language contained in the instruction to guide a jury in determining whether there was a "gross deviation" below the reasonable care standard. The language used may, in a given case, allow a fact finder to find a defendant guilty of negligent homicide although he willed the consequences of his act. The jury charge most commonly used is as follows:
The defendant is charged with the crime of negligent homicide as defined in Art. 32 of the Criminal Code of the State of Louisiana as follows: "Negligent homicide" is the killing of a human being by criminal negligence. The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.
Criminal negligence is defined in Article 12 of the Criminal Code as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonable careful man under like circumstances.
To put it another way, the term criminal negligence means GROSS NEGLIGENCE or RECKLESSNESS such as to amount to a RECKLESS DISREGARD for one's own safety or safety of others and a WILLFUL INDIFFERENCE to the consequences liable to follow. Criminal negligence means something more than mere carelessness, mistake, error in judgment or omission of duty. It means a degree of negligence more serious or aggravated than would ordinarily give rise to civil liability. It is more than the mere omission to do something which a reasonable *1325 and prudent man would do, or the mere doing of something which such a man would do under the circumstances surrounding each particular case. CRIMINAL NEGLIGENCE IS SUCH GROSS NEGLIGENCE AS MIGHT CAUSE A REASONABLE AND PRUDENT MAN TO EXPECT THAT INJURY OR DAMAGE TO THE PERSON, PROPERTY OR RIGHTS OF OTHERS MIGHT RESULT FROM HIS NEGLIGENT ACT. It is such GROSS NEGLIGENCE AND RECKLESSNESS as might exist if he WILFULLY does an act when he KNOWS it is likely or probable that injury or damage may result from the doing of the act. However, it is not necessary that there be an intent or will concurring the negligence or omission which causes death, BECAUSE IF THE ACT WAS INTENTIONAL and with the purpose of causing death or great bodily injury, then the offense would be murder or manslaughter instead of negligent homicide. (The remainder of the charge is omitted).
The words GROSS NEGLIGENCE, RECKLESSNESS and especially WILLFULLy convey to the average fact finder something closely related to yet not quite criminal intent. I, therefore, conclude that a jury or a judge may well find a defendant charged with negligent homicide to be guilty of that crime although he finds that the defendant acted willfully, i.e. he deliberately made a criminally faulty choice.
Although the definition of criminal consequence in Article 12 specifically precludes the presence of either specific or general criminal intent, and the crime of negligent homicide does not require an intentional act, the defendant cannot cite his intentional shooting of the victim as a defense to a conviction for criminal negligence. Were it so, each defendant charged with negligent homicide would simply say that he SPECIFICALLY INTENDED the homicide and thus defeat prosecution. LSA-R.S. 14:5 permits the prosecution of a greater offense and conviction of one of the lesser included offenses. But "then, too, it should never be a defense to an offender to assert that an added criminal element was present making him guilty of a more serious crime", i.e. acquitting him because of it. See, Reporter's Comment to LSA-R.S. 14:5.
There is no merit to appellant's contention that he should be acquitted on the basis of his admittedly intentional shooting of the victim.

THE CONTRADICTORY NATURE OF THE TESTIMONY GIVEN BY THE STATE'S WITNESSES AND THE STATE'S FAILURE TO MEET ITS BURDEN OF DISPROVING THE DEFENDANT'S CLAIM OF SELF DEFENSE.
In my view, the State did not disprove the defendant's justification defense of self-defense and defense of others.
The incident culminating in the victim's death began with a report that a person named "Virgil", possibly armed, was selling drugs at the corner of Stemway Drive and Warfield Street. Police Officers Fenner and Tallant arrived at the scene and saw a subject fitting the dispatcher's description. The officers patted down Braud and Esteen and took from Braud a film canister commonly used as a container for drugs. The officers attempted to arrest and handcuff Braud, but failed because Braud exhibited extraordinary strength and withstood all efforts by the officers. Although the officers gave verbal warnings, Braud continued to resist. In the course of their struggle, Braud and Tallant lost their balance and both fell to the ground. During the struggle, a call signal 1055, police officer needs assistance, was called in. Meanwhile, Tallant and Braud rolled over on the ground from side to side, either one or the other being on the top. During the struggle Fenner saw Tallant's pain-filled face when Braud bit him. Braud continued to resist all efforts to be arrested and handcuffed. Fenner testified that he saw Braud go for Tallant's gun and eventually grab it. Officer Tallant corroborated that testimony. Fenner had already drawn his gun when Braud tried to take Officer Tallant's gun, and Fenner, from his position close to the combatants, *1326 concluded that defensive force was immediately necessary, and that Braud's force would be deadly if he were not stopped. The confrontation between Braud and the officers required a rapid decision as to the means Fenner would use in his own and his partner's defense. Fenner testified that he deferred using his weapon during the struggle prior to Braud's taking Tallant's gun, because the struggle between his partner and Braud was so confused that he feared he would more likely injure his partner than contain Braud. The coroner testified that the entry wound indicated a shot in a downward direction, giving credence to the fact that Braud was shot as he struggled on the ground with Officer Tallant.
Many witnesses testified for the prosecution in this trial. Some of them saw the struggle between Officer Tallant and Braud, but no one was in a position to be able to see whether and when Braud would have been in a position to do great harm to the officers; whether and how long Braud was on top of Officer Tallant; what Fenner did with his gun and at what precise moment during the struggle he fired the fatal shot. It is unclear from the testimony whether Fenner ever had the opportunity to resort to other measures, aside from using an asp unsuccessfully. Fenner did not have the opportunity to retreat. All the prosecution witnesses contradicted each other on all the important details. Some observed the incident from distances which made it impossible to see what they claimed to have seen. There is testimony in the record that one witness saw the shooting clearly, when the struggle took place in a location invisible to the witness (the struggle with Braud was toward the left rear quarter panel of the police car). Measuring this overstated testimony against the exigencies of the split seconds during which Fenner had to decide what to do in order to protect his partner and himself from great bodily harm, it is clear that the prosecution did not prove beyond a reasonable doubt that Fenner was not justified in acting in self-defense and defense of his partner. The testimony, in my view, does not establish the prosecution's proof beyond a reasonable doubt that the shooting was unjustified.
It is well settled that a defendant in a homicide prosecution who asserts that he acted in self-defense does not have the burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was feloniously committed and was not perpetrated in self-defense. State v. Carter, 227 La. 820, 80 So.2d 420 (1955) and numerous cases cited in State v. Patterson, 295 So.2d 792 (La.1974).
On appeal, the relevant inquiry is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Rader, 609 So.2d 857 (La.App. 5 Cir.1992). The State's case failed to meet this standard. It is for this reason that I reverse the judgment of the trial court.
NOTES
[1] The decedent's name is spelled "Braud" or "Breaux" in the trial transcript.
[2] In State In Interest of Malter, 508 So.2d 143 (La.App. 4th Cir.1987) a juvenile who killed his friend with a BB was charged with negligent homicide. This Court found him guilty of negligent homicide even though it also found that "Malter intended to shoot the victim and was aware that serious harm might result from this action." Id. at 144. (Emphasis added.) However, it does not appear that the defendant raised a defense that a finding of intent excludes or prevents a finding of negligence.
[1] This concurrence will address these two assignments only, because our reversal makes the assignment which concerns the exclusion of specific evidence of the decedent's violent character moot.
[2] Negligent homicide is a lesser included offense only to the crime of Vehicular Homicide, a crime which involves a killing whether or not the offender had the intent to cause death or great bodily harm. C.Cr.P. art. 814(A.)(7.1.).