# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-477

**STATE OF LOUISIANA**

**VERSUS**

**ELIZABETH MARIE ALFRED**

\*\*\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, DOCKET NO. CR-177317
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*\*\*
**LEDRICKA J. THIERRY**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Jonathan W. Perry, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

**Don Landry, District Attorney**
**Kenneth P. Hebert, Assistant District Attorney**
**15ᵗʰ Judicial District**
**P.O. Box 3306**
**Lafayette, LA  70501**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O. Box 2125**
**Lafayette, LA  70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Elizabeth Marie Alfred**

**THIERRY, Judge.**

## FACTS AND PROCEDURAL HISTORY

At approximately 10:47 p.m. on January 24, 2020, police officers were dispatched to an apartment located at 804 Martin Luther King, Jr. Drive in Lafayette, Louisiana, to respond to an aggravated battery. When the police arrived, they discovered the victim, Phillip Joe Nelson, unresponsive due to an apparent stab wound to the chest. Mr. Nelson was pronounced dead at the scene. The police conducted an initial crime scene investigation which implicated Mr. Nelson's "on-again, off-again" girlfriend, Defendant, Elizabeth Marie Alford, as the assailant. Defendant was questioned by the police and arrested for second degree murder on January 25, 2020. After the grand jury did not return an indictment for second degree murder, Defendant was formally charged with manslaughter.

On June 2, 2020, Defendant, Elizabeth Marie Alfred, was charged by bill of information with manslaughter, in violation of La.R.S. 14:31. On June 11, 2020, Defendant waived a formal reading of the bill and entered a plea of not guilty. A jury unanimously found Defendant guilty of the responsive verdict of negligent homicide, in violation of La.R.S. 14:32, on July 15, 2021.

On February 3, 2022, after a presentence investigation was conducted, the trial court held a sentencing hearing, after which Defendant was sentenced to five years at hard labor, with all but eighteen months suspended, and placed on three years of active supervised probation. The trial court also ordered Defendant to pay court costs in the amount of $435.50. Defendant's motion to reconsider sentence was denied without a hearing.

Defendant filed a motion for appeal which was granted by the trial court. She is now before this court alleging one assignment of error: there was insufficient

evidence to sustain her negligent homicide conviction as the State failed to disprove the homicide was committed in self-defense. For the reasons which follow, we affirm Defendant's conviction and sentence.

## ANALYSIS

In her sole assignment of error, Defendant alleges the evidence was insufficient to support her conviction for negligent homicide. Defendant does not contest that she killed Mr. Nelson by stabbing him with a knife, but instead argues the State failed to disprove beyond a reasonable doubt that the homicide was committed in self-defense.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), *State v. Captville*, 448 So.2d 676, 678 (La.1984). The *Jackson* standard of review does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citations omitted). It is not the appellate court's function to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443. When the factfinder is faced with contradictory testimony, the weight of the testimony lays solely with the jury, "who may accept or reject, in whole or in part, the testimony of any witness." *State v. Hypolite*, 04–1658, pp. 4 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06–618 (La. 9/22/06), 937 So.2d 381. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should

3

not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Lambert*, 97-64, pp. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727.

Louisiana Revised Statutes 14:32(A)(1) defines negligent homicide as "[t]he killing of a human being by criminal negligence." However, La.R.S. 14:20 provides, in pertinent part:

> A. A homicide is justifiable:
>
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
>
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

When a homicide defendant claims self-defense, the State has the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense; a defendant does not assume a burden of proving self-defense. *State v. Lynch*, 436 So.2d 567 (La.1983). This court discussed the factors to be considered in examining a self-defense claim in *State v. Guillory*, 17-403, p. 4 (La.App. 3 Cir. 10/11/17), 229 So.3d 949, 953-54, *writ denied*, 17-1964 (La. 6/1/18), 244 So.3d 437:

> In *State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), [216] So.3d [800], this court stated:
>
>> "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683,

4

pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

*Review of Evidence Adduced at Trial*

We note at the outset that the jury was confronted with various conflicting accounts of the events which lead to Mr. Nelson's death and were, consequently, called upon to resolve several factual disputes.

The first witness to testify was Ransonasia Thomas, who stated she went to the apartment party on January 24, 2020. Ms. Thomas testified as she was walking up the stairs to enter the apartment, she heard Defendant "hollering." After entering, Ms. Thomas noticed there were a lot of people in the small apartment. She observed there was an ongoing verbal argument between Defendant and Mr. Nelson which then turned physical. Ms. Thomas assumed Mr. Nelson became aggravated with Defendant's hollering, so he "grab[bed] her by her arms and pushed her against the wall." According to Ms. Thomas, when Defendant continued hollering, Mr. Nelson pushed Defendant on the couch in a manner which she characterized as "nonviolent," and then he let Defendant go. Ms. Thomas testified that Defendant got off the couch, went to the kitchen, and grabbed a pot, but Mr. Nelson did not follow Defendant to the kitchen. Ms. Thomas indicated she was in a position where she could clearly see what was happening in the kitchen. She stated she then saw Defendant grab a knife, walk up to Mr. Nelson, and "slice" down at him twice,

5

hitting him the first time. Ms. Thomas testified that she yelled Defendant's name, but Defendant appeared to be "so out of it."

Ms. Thomas further clarified that she witnessed Mr. Nelson grab Defendant by the neck during the altercation, but it did not appear Defendant was having trouble breathing or that Mr. Nelson was trying to kill Defendant. Ms. Thomas surmised that Mr. Nelson was merely trying to get Defendant to stop hollering and to calm down. Thus, she considered the choke to be "nonviolent." Ms. Thomas testified that she did not see Mr. Nelson hit Defendant during the altercation, though she heard Mr. Nelson threaten to slap Defendant. Conversely, Ms. Thomas testified Defendant did physically strike Mr. Nelson. According to Ms. Thomas, Justin and Brianna Berard tried to break up the altercation at one point.

On cross-examination, Ms. Thomas acknowledged that she entered the apartment as the argument was underway. Defense counsel asked Ms. Thomas about her interview with police where she stated that Defendant was yelling for help as Mr. Nelson was choking her against the wall and on the couch. Ms. Thomas testified that she did not remember everything from that night but answered affirmatively that Defendant was asking for help. Defense counsel also asked Ms. Thomas about her prior statement in which she told police that she could not see in the kitchen from her point of view. Ms. Thomas testified that Mr. Nelson did not follow Defendant all the way into the kitchen, but he went as far as the kitchen doorway where she could see.

The State then called Davanaisha Berard to testify. Davanaisha testified that she lived at the apartment where the incident occurred with her sister, Brianna Berard. She stated there were approximately twenty people in the apartment, including Mr. Nelson and Defendant. Davanaisha testified she did not witness the

argument or the stabbing, because she was taking a bath. Davanaisha indicated that both Mr. Nelson and Defendant were related to her. The State asked Davanaisha about her statement to police following the incident. Davanaisha testified that she remembered telling the police she did not witness "the whole thing," but she did see Mr. Nelson hitting Defendant and heard Defendant asking for help. Further, Davanaisha confirmed that she told the police Defendant hit Mr. Nelson while trying to fight back.

Officer Amelia Soileau with the Lafayette City Police Department testified as the first responding officer at the scene. Upon arriving at the apartment complex, Officer Soileau encountered and briefly talked to Defendant and Brianna in the parking lot. At trial, Officer Soileau testified that she initially thought Defendant was the victim, because she was crying hysterically. Officer Soileau then heard people yelling for help and located Mr. Nelson on the outside stairs leading to the apartment. Officer Soileau testified that she began administering aid as Mr. Nelson did not have a pulse and was bleeding profusely from his chest; however, Mr. Nelson did not survive his injury.

Sergeant Raymond Overby testified that he was a crime scene investigator for the Lafayette Metro Crime Scene Unit at the time of the incident. As part of his investigation, Sergeant Overby took photographs and a video of the stairs leading to the apartment which were admitted into evidence. Sergeant Overby also took photographs of the inside of the apartment after securing a search warrant. The photographs show a trail of blood going from the kitchen area, through the living room area to the apartment door, and down the stairs outside the apartment.

Dr. Christopher Tape was accepted as an expert in forensic pathology and testified that he performed the autopsy on January 27, 2020. Dr. Tape determined

Mr. Nelson's cause of death to be a stab wound to the left chest and the manner of death to be homicide. He testified the knife penetrated five inches into Mr. Nelson's chest cavity at a downward angle and perforated his heart, which caused death to occur within ten minutes. Dr. Tape indicated the toxicology report revealed Mr. Nelson had alcohol and marijuana in his system.

The State then called the lead detective on the case, Detective Lauren White. Detective White stated Defendant waived her right against self-incrimination and agreed to talk to her on January 25, 2020, several hours after the incident. She testified Defendant told her during the interview that Mr. Nelson hit her and choked her, but Detective White did not find any physical evidence to substantiate Defendant's claim:

> Q. Now, Detective, during that interview, she told you that Phillip was hitting her?
>
> A. Yes, sir.
>
> Q. Okay. And, during your investigation, did you have an occasion to search for evidence of any abuse -- abrasions, bruises?
>
> A. Well, when she said that he was choking her, that's when I was looking at her neck. I didn't see any marks.
>
> . . . .
>
> A. These are pictures of Ms. Alfred, the night that the incident occurred -- or early morning hours -- in the interview room, that were taken by Detective Overby, I believe.
>
> . . . .
>
> Q. Now, as you look at them today, do you see any evidence of any altercation?
>
> A. No, sir.

The State then introduced Defendant's interview with Detective White. Detective White testified that she also interviewed numerous eyewitnesses.

8

According to Detective White, who was not under sequestration during the trial, Davanaisha's testimony was inconsistent with her prior statement to police, and Davanaisha did not recall a lot of details from that night. Davanaisha stated in her interview that she was present during the incident and witnessed Mr. Nelson push Defendant against the wall and Defendant hit Mr. Nelson. Davanaisha also detailed in her statement to Detective White that Defendant kept lunging at Mr. Nelson while Brianna was attempting to stop the physical fight. Davanaisha told Detective White that she saw Defendant stab at Mr. Nelson twice in the kitchen as he was trying to back up. Detective White stated her investigation concluded after she interviewed the eyewitnesses:

> A. Yes, sir. After talking to everyone I spoke with, looking at the totality of everything, everything I was told -- as far as, you know, Ms. Alfred not having any marks on her, Phillip being stabbed, her admitting to stabbing him, you know, people there saying, yes, they were fussing/fighting, that he wasn't striking her, he was restraining her -- I ended up getting a warrant for second-degree murder[.]

After the State rested, the defense called Brianna Berard to testify. Brianna stated that both Defendant and Mr. Nelson were related to her. When asked about the incident on January 24, 2020, Brianna testified that Mr. Nelson "picked a fuss with [Defendant]" after arriving at the apartment. Brianna stated then Mr. Nelson choked and hit Defendant. According to Brianna, Mr. Nelson was on top of Defendant on the couch, choking her. Brianna testified that she tried to stop Mr. Nelson but she was only successful in breaking up the initial physical conflict between Defendant and Mr. Nelson.

On cross-examination, Brianna acknowledged that she was going back and forth from her apartment to Defendant's nearby apartment to check on children during the party. When the State asked about her prior statement in which Brianna

9

told the police that she was checking on the children when she heard that Mr. Nelson had been stabbed, Brianna admitted that was an accurate statement. Brianna also acknowledged that she did not tell the police about Mr. Nelson choking Defendant on the couch. Brianna's testimony concluded with her stating that she was not in the apartment when the stabbing occurred.

Next, Jacob Morrison testified for the defense. Mr. Morrison testified that he was at the party and witnessed the altercation between Defendant and Mr. Nelson. According to Mr. Morrison, Mr. Nelson grabbed Defendant, choked her against the wall, threw her on the couch, and choked her on the couch. Mr. Morrison stated that he was on the couch when Mr. Nelson threw Defendant on it, so Mr. Morrison got up and walked towards the kitchen to get away from the situation. Mr. Morrison testified Defendant shouted for help and ran away from Mr. Nelson, but Mr. Nelson chased her into the kitchen. The stabbing occurred approximately thirty seconds after Defendant ran into the kitchen.

On cross-examination, Mr. Morrison confirmed he arrived at the apartment as the argument was ensuing and did not see who initiated the altercation. Mr. Morrison also conceded that he did not tell the police in his interview that Mr. Nelson grabbed or choked Defendant, but he claimed this was due to his lapse in memory after witnessing the traumatic event. However, Mr. Morrison did tell the police that Defendant and Mr. Nelson fell on him while he was sitting on the couch.

The last witness to testify was Defendant, who explained that she asked Mr. Nelson to break up a fight at the party, but he refused. This caused the pair to begin verbally fighting which escalated into a physical altercation. Defendant described the fight as follows:

10

A.  Okay. First, he pushed me against the wall. He had me stranded [sic] up, like this. Stranded [sic] up, like this (demonstrating). Choking me against the wall.

And then, after that, we fell. Then, turn around. I was angry, afraid. And I ran to the kitchen. I grab[bed] a knife, and I turn[ed] around and swung it. I swung it like this (demonstrating). And it cut him.

And, when I [saw] the blood, the blood was just dropping. And I dropped the knife. And he walked outside. . . .

Defendant testified that the apartment was very small, and it was a very short distance from the living room to the kitchen. By the time she ran to the kitchen, grabbed the knife, and turned, Defendant testified Mr. Nelson was there. Defense counsel asked Defendant why she swung the knife, and she answered:

A.  Because I was afraid for my life. I couldn't breathe. And I was telling everybody I couldn't breathe.

Q.  Is this the first time this has ever happened?

A.  No.

Q.  What times in the past has anything similar to this happened?

A.  When I was pregnant, one time.

Q.  Any other times, besides that?

A.  No. A busted lip. That's about it.

. . . .

Q.  Have you ever been afraid of Joe, in the past?

A.  Yeah. Sometimes, yes.

Defendant testified that when Mr. Nelson was choking her, she could not breathe, and she felt anger, fear, stress, and pain when she picked up the knife. Defendant stated she felt there was no other way out of the situation.

11

On cross-examination, Defendant testified that she did not want to kill Mr. Nelson; she only wanted to scare him with the knife. Despite Dr. Tape's testimony that the knife penetrated five inches into Mr. Nelson's chest, Defendant maintained that she swung the knife and cut him. The State asked Defendant whether she could have left the apartment instead of going into the kitchen, and Defendant responded that the front door was blocked by a group of people. Defendant denied ever grabbing a pot to hit Mr. Nelson as Ms. Thomas had testified or lunging at Mr. Nelson during the altercation as Davanaisha had told Detective White in her interview. The State then questioned Defendant about her interview with Detective White on January 25, 2020, asking why Defendant did not say at that time that Mr. Nelson choked her. Defendant responded:

> A.     I told the detective he was straining [sic] me. That's like choking me. Having me against the wall. That's choking me.

> Q.     Well, you said "straining me"?

> A.     Yes, sir.

> Q.     Does that mean restrain?

> A.     I said he was straining me. Straining me.

> Q.     Straining?

> A.     Yes, sir.

> Q.     But not strangling. Right?

> A.     He was strangling me.

> Q.     Oh, now, he's strangling you. But you told the police he was straining you.

> A.     He was strangling me, like choking me.

Defendant testified Mr. Nelson abused her over the nine years they were together. At one point in her testimony, Defendant claimed Mr. Nelson had

previously pushed her, never hitting her, but Defendant later testified that Mr. Nelson had punched her and busted her lip while she was pregnant. Defendant stated that she called the police to report Mr. Nelson's abuse on previous occasions. The State asked Defendant if she would be surprised to know there were only two police reports filed against Mr. Nelson for allegedly abusing her and that neither allegation was corroborated. Defendant answered that she would not be surprised. On redirect, Defendant testified that Mr. Nelson was in and out of jail for charges related to drugs and guns during their relationship.

*Self-Defense*

Having discussed the relevant law and the evidence adduced at trial, we must determine whether the State met its burden of disproving the negligent homicide was committed in self-defense. As previously noted, it is necessary to consider the following when examining a claim of self-defense: (1) whether Defendant reasonably believed she was in imminent danger of death or great bodily harm, (2) whether the killing was necessary to prevent death or great bodily harm, and (3) whether Defendant was the aggressor. *Guillory*, 229 So.3d 949. However, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. *State v. Taylor*, 96-1043 (La.App. 3 Cir. 2/5/97), 688 So.2d 1262.

In brief to this court, Defendant asserts her belief that the killing was reasonable because (1) there were a lot of people partying and drinking in the small apartment which exacerbated the excitement and confusion of the situation; (2) there was no one willing to help her stop Mr. Nelson's attack after Brianna left the apartment; and (3) there was a history of Mr. Nelson physically abusing Defendant.

13

Defendant contends she reasonably believed she was in imminent danger of great bodily harm, because Mr. Nelson choked her and then immediately chased her to the kitchen when she got away. Finally, Defendant maintains that even if she had incited the verbal argument, Mr. Nelson was the aggressor of the physical altercation. Defendant therefore concludes her negligent homicide conviction must be reversed and an acquittal entered as the State did not disprove self-defense.

In contrast, the State argues the evidence was sufficient to prove Defendant did not act in self-defense when she killed Mr. Nelson based on the testimony of Ms. Thomas. The State claims that Defendant was the aggressor the night of Mr. Nelson's death. The State concludes Defendant's conviction must be affirmed because the jury heard all the evidence, including Defendant's testimony that the killing was perpetrated in self-defense, and chose to reject her theory of justification.

In evaluating Defendant's claim, we note the record in this case is filled with inconsistent and conflicting testimony. Nearly every eyewitness' trial testimony was undermined to some degree by their prior statements to police. It is uncontradicted that Defendant and Mr. Nelson engaged in a verbal argument that turned into a physical altercation while at the apartment party; however, testimony differed as to whether Mr. Nelson was restraining or strangling Defendant and whether Mr. Nelson pursued Defendant when she ran to the kitchen. Nevertheless, the testimony was not so inconsistent as to the essential facts to indicate the State failed to meet its burden of disproving self-defense. *Contra State v. Fenner*, 94-1498 (La.App. 4 Cir. 11/16/95), 664 So.2d 1315, *writ denied*, 95-3001 (La. 4/26/96), 672 So.2d 679.

The State offered the trial testimony of Ms. Thomas who testified that Mr. Nelson grabbed Defendant by the arms and pushed her against the wall and then onto the couch. Ms. Thomas detailed that although Mr. Nelson choked Defendant,

14

it did not appear she was having a hard time breathing or that Mr. Nelson was trying to kill her. Based on those observations, Ms. Thomas characterized the choke as "nonviolent." More importantly, Ms. Thomas testified that Mr. Nelson did not follow Defendant into the kitchen, but rather, Defendant returned towards Mr. Nelson after grabbing a knife and stabbed him. Though Brianna and Mr. Morrison, both defense witnesses, told a different version of events, the jury evidently found them to be less credible. The State confronted these defense witnesses with their police statements which were taken immediately after the incident, mentioning that when they initially spoke with police, they did not reveal significant details about the altercation between Defendant and Mr. Nelson. The State further noted that Brianna was Defendant's cousin and Mr. Morrison was Defendant's friend. Moreover, Defendant's testimony that she merely swung the knife and cut Mr. Nelson was irreconcilable with Dr. Tape's testimony that the knife penetrated a full five inches into Mr. Nelson's chest at a downward angle. When weighing the conflicting and inconsistent testimony, the jury obviously found Ms. Thomas more credible than the other witnesses, including Defendant.

The jury was also presented with evidence revealing that Defendant fled the scene after the stabbing, which does not comport with that of a person who believed she acted in self-defense. Officer Soileau testified that Defendant was walking away from the apartment when she arrived on the scene, and the apartment complex's surveillance videos show Defendant leaving the scene with Brianna. Flight is a circumstance from which guilt can be inferred. *State v. Davies*, 350 So.2d 586 (La. 1977); *State v. Rubens*, 10-1114, p. 7 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, *writ denied*, 12-374 (La. 5/25/12), 90 So.3d 410, *and writ denied*, 12-399 (La. 10/12/12), 99 So.3d 37, *cert. denied*, 568 U.S. 1236, 133 S.Ct. 1595 (2013).

At trial, the State argued that Defendant could have avoided killing Mr. Nelson by leaving the apartment instead of going into the kitchen, and the State reasserts that argument on appeal. However, this argument is not critical as Ms. Thomas' testimony negated a self-defense scenario. Moreover, retreat or escape may not be considered in a self-defense analysis. *See State v. Wilkins*, 13-2539 (La. 1/15/14), 131 So.3d 839; *State v. Wells*, 14-1701 (La. 12/8/15), 209 So.3d 709.

As the trier of fact, the jury is free to accept or reject, in whole or in part, the testimony of any witness. *See State v. Dorsey,* 10-216 (La. 9/7/11), 74 So.3d 603, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012); *State v. Johnson,* 09-259 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, *writ denied*, 09-2263 (La. 4/16/10), 31 So.3d 1054. Importantly, the standard of review calls for a determination of whether "any"—and not "every"—rational factfinder could have found proof of all the essential elements beyond a reasonable doubt. In this case, the jury clearly chose to believe the evidence and testimony that contradicted Defendant's self-defense claim. Given the evidence discussed above, we cannot say the jury's credibility findings were clearly contrary to the evidence.

Accordingly, the State met its burden of disproving that the homicide was committed in self-defense, and therefore, Defendant's conviction and sentence are affirmed.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**