LBYRNES, Judge.
Pamela Clark appeals her conviction and sentence for second degree murder. We reverse and remand for a new trial.

STATEMENT OF THE CASE

On September 12, 1996, Pamela Clark was indicted for the second degree murder of Leroy Seabrook. On March 26, 1997, a jury found her guilty as charged. On that date the trial court denied her motion for new trial. The trial court denied the defendant’s second motion for new trial and a motion for post verdict judgment of acquittal on April 18, 1997. On that date the trial court sentenced the defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence, and it also granted her motion for appeal.

FACTS

In the early afternoon of July 29, 1996, Leroy Seabrook was stabbed once in the chest outside the Manchu Food Store located at the corner of Esplanade and |2North Claiborne Avenues. A friend drove Seabrook to Charity Hospital, where Seabrook later died. An autopsy revealed that the single chest wound injured his heart and aorta. Lab work also indicated the presence of a heroin derivative in his bloodstream.
Seabrook was stabbed during a disturbance involving the defendant Pamela Clark which originated inside the food store. The proprietor of the store, Tommy Nguyen, testified that he observed Ms. Clark and Seabrook arguing inside the *140 store, but he did not observe Seabrook hit Ms. Clark, nor did he see the stabbing which occurred outside the store. The proprietor stated that Ms. Clark followed Seabrook out of the store.
Deloris Clay testified she had just alighted from a public transit bus across the street from the store when she saw Seabrook standing in front of the door to the store, with Ms. Clark, her husband, and her friend Linda circling around Sea-brook, pointing at him and preventing him from moving. Ms. Clay stated Seabrook broke through them and walked toward a car parked in the parking lot. The car was driven by a man she identified as “Lucky”. Ms. Clay related that “Lucky” was inside the car in the driver’s seat. When Seabrook reached the car, he opened the front passenger door and stood in front of the door, facing Ms. Clark and her husband. Ms. Clay stated that Ms. Clark continued shouting at Seabrook, and suddenly she lunged at him and stabbed him with a knife as he was attempting to enter the car. Seabrook fell into the car, but was apparently unable to get his leg inside the door. Ms. Clay testified that Ms. Clark turned and walked back toward a | astroller containing her child, while Ms. Clark’s husband slammed the car door on Seabrook’s leg three or four times. Ms. Clay stated that when Ms. Clark reached the stroller, her friend Linda pointed out that she was still holding the knife. Ms. Clark then screamed that she did not like “the way that it went down.” Ms. Clay testified that the car containing Seabrook drove off, and Ms. Clark spoke briefly with her husband before leaving the scene. Ms. Clay stated that she did not see Sea-brook hit Ms. Clark. She related that she did not see a knife in Ms. Clark’s hand prior to the stabbing. Ms. Clay did not see Ms. Clark pick anything up from the ground prior to the stabbing. Ms. Clay also insisted she saw Ms. Clark make multiple stabbing motions toward Seabrook.
Walter James, a/k/a “Lucky”, testified that he and Seabrook had been drinking prior to their arrival at the store. Sea-brook went into the store to get oil for James’ car. Seabrook was inside the store for more than ten minutes when he emerged, arguing with Ms. Clark. James testified that he told Seabrook to “leave that alone and come on.” James testified Seabrook was getting into the car when Ms. Clark hit him, although James did not know with what she hit him. James related that Ms. Clark’s husband then slammed the door on Seabrook’s foot before James was able to drive from the scene. James insisted he did not see Seabrook hit Ms. Clark. He admitted having a prior conviction involving marijuana.
Ms. Clark was arrested pursuant to a warrant later that evening.
Will Davis testified that he is the common-law husband of Ms. Clark and the father of her children. On the day of the stabbing he and Ms. Clark were walking |4in the area when he stopped to speak to some. friends standing under the North Claiborne overpass, on the neutral ground, while Ms. Clark went into the store. Davis noticed Seabrook run out of the store, followed closely by Ms. Clark, who was holding her face. Ms. Clark yelled that Seabrook had hit her, and Seabrook was also yelling something to Lucky that Davis did not comprehend. Davis stated that Seabrook jumped into Lucky’s car and began reaching for something under the seat. At that point, Davis ran across the street and approached the car. He saw Lucky reaching across Seabrook as if to lock the car door, and then he saw Seabrook come back up, holding a pocket knife. Davis then slammed the car’s door to keep Seabrook inside, and the car drove from the scene.
Davis admitted seeing Ms. Clark hit Seabrook, but he insisted Ms. Clark hit Seabrook in the head while Seabrook was standing near the back of the car. Davis also insisted he did not see anything in Ms. Clark’s hands, and he denied that she reached around him to stab Seabrook. Davis stated that Lucky and Seabrook of *141 ten stole items and then sold them to the owner of the Manchu store. Davis admitted giving a statement to the police wherein he failed to mention that Seabrook produced the knife, and he denied telling the police that Ms. Clark hit Seabrook after Seabrook entered the car (contrary to the contents of the written statement).
Ms. Pamela Clark admitted being a prostitute in New Orleans and in Chicago, where she had previously lived. She testified that she and Davis had two children. She stated that just prior to the stabbing she was inside the store, getting food for her and her children, when she discovered she needed fifteen cents more. |fiThe man behind her offered to give her the extra money after he had paid for his items. Seabrook entered the store and began calling her names. She and the others in line ignored him. When the man behind her completed his transaction and gave her the fifteen cents, Seabrook told the man that he would not give her anything, again referring to Ms. Clark in derogatory terms. Ms. Clark testified that she paid for her items and began walking out of the door when Seabrook stood in front of her and told her he was talking about her. He called her more derogatory names and became incensed when she referred to his mother using the same terms. Ms. Clark testified Seabrook then hit her in the face, and she ran out of the store.
Ms. Clark testified that she told Davis that Seabrook had hit her, and as Sea-brook walked past them, Seabrook stated: “I’m going to show you what’s up with that bitch in a few minutes.” Seabrook walked to Lucky’s car and reached inside under the seat. Ms. Clark stated that she moved her babies, in the stroller, out of the way and picked up a broken knife that was lying on the ground. She stabbed Sea-brook once in the shoulder, and then she collected the stroller containing her babies and walked away from the scene. Sea-brook got into the car, and the car left. She took the children to the park and eventually went home, where she was arrested. Ms. Clark denied seeing Ms. Clay on the scene. She also denied hitting Sea-brook, insisting she only stabbed him once when he appeared to be reaching for a weapon under the seat of Lucky’s car. She insisted Davis was mistaken about his whereabouts at the time of the stabbing. Davis was not under the overpass when she exited the store, but instead he was standing near Lucky’s | ficar. She reached around Davis to stab Seabrook. In addition to her prostitution convictions, Ms. Clark admitted having prior convictions for simple robbery, misdemeanor theft, and the possession with the intent to distribute pentazocine. She insisted she did not think she had injured Seabrook to the extent that he would die.

Errors Patent

A review of the record for errors patent reveals that the trial court sentenced Ms. Clark on the same date that it denied her motion for new trial, and there is no indication that she waived her right to the twenty-four hour delay pursuant to La.C.Cr.P. art. 873. Failure to observe the delay is deemed harmless error where the defendant does not challenge his sentence on appeal. State v. Collins, 584 So.2d 356 (La.App. 4 Cir.1991). In the present case where the defendant did not raise the issue on appeal, any error was harmless.
In addition, the minute entry of trial indicates a potential problem with the jury’s vote. Ms. Clark was charged with second degree murder, a charge for which the sentence is life imprisonment at hard labor. La.C.Cr.P. art. 782 required that the case be tried by twelve jurors, ten of whom had to agree to the verdict. The minute entry indicates there were twelve jurors, but it also indicates that the final verdict total was 10-0 to convict. This may be interpreted to mean that ten jurors voted to convict without specifying whether the other two jurors refrained from voting. It is more likely that there is a typographical error where the verdict was factually 12-0 to convict. Under both *142 interpretations the minute entry establishes that the jury verdict contained the sufficient number of votes to convict.
Where there is a conflict between the minute entry and the trial transcript, the transcript controls. State v. Fenner, 94-1498 (La.App. 4 Cir. 11/16/95), 664 So.2d 1315, writ denied 95-3001 (La.4/26/96), 672 So.2d 679. In the present case the record contains the jury’s verdict sheet which is hand written and signed by Claudette H. Vallery. It states: “We the jury, find the defendant (1) guilty as charged.” The trial transcript shows that the minute clerk read the jury’s verdict sheet aloud in court. The trial transcript also indicates that when the verdict was rendered, the trial judge noted that the verdict was legal. Any error in the minute entry is deemed to be harmless.
There are no other patent errors.

Assignment of Error

Ms. Clark contends the trial court erred by denying her motion for mistrial when it was discovered, at some point after the jury retired for deliberations, that a person chosen for the jury had mistakenly been excused, and a person who had been excused had been seated, had heard the evidence, and was present in the jury room. The trial transcript reveals that at some point after the jury had retired for deliberations, the jury discovered that there was no jury verdict slip for one of the seated jurors, Ms. Brown, but instead it had received a slip for a juror who was not seated, Ms. Reed. The State had used a peremptory challenge to excuse Ms. IsBrown, but for some reason she remained while Ms. Reed, who was acceptable to both sides, left.
Upon discovering this mistake, the State moved to excuse Ms. Brown and replace her with the alternate, Mr. Camp. The court agreed, noting that as soon as the mistake was discovered, it ordered the jury to stop deliberating, if indeed it had begun to do so. The court then ordered that the alternate juror be summoned from his sequestered spot, that he replace Ms. Brown, and that the jury be ordered to begin deliberations. The court noted that the alternate juror was seated after both sides had exhausted its peremptory challenge for the alternate. The defense objected and moved for a mistrial, which the court denied.
Ms. Clark now argues that the trial court erred- by denying her motion for mistrial because the excused juror had participated in deliberations up to the point the mistake was realized, and this participation tainted the jury.
In State v. Searile, 94-7 (La.App. 3 Cir. 10/5/94), 643 So.2d 455, the alternate juror was dismissed after jury instructions, but the court invited the juror to remain to view the outcome of the case. When the verdict was returned, the alternate juror was polled along with the other jurors. The record was silent, however, as to whether the alternate juror participated in deliberations. The appellate court remanded the case for an evidentiary hearing to determine if the alternate had indeed participated in deliberations.
In State v. Barber, 97-2749 (La.4/24/98), 708 So.2d 1054, the Louisiana Supreme Court remanded the case for a hearing to determine whether and to what Rextent the presence of alternate jurors in the jury room during deliberations may have affected the outcome. The Supreme Court stated:
... Participation by alternates in deliberations is an extraneous influence on the jury representing a prima facie case of prejudice requiring reversal. La. C.E. art. 606(B).... Louisiana courts are “required to take evidence upon well-pleaded allegations of prejudicial juror misconduct .... ” [citations omitted] At the conclusion of the hearing, the trial court shall determine whether a new trial or other appropriate relief is required, reserving to the parties a right to seek review of the ruling.
*143 Substitution of the alternate for a properly-seated juror who became unable to sit, even after deliberations had begun, would be a valid course of action if the trial court ordered the jurors to begin deliberations anew with the alternate juror. La. C.CrJP. art. 789, provides in part that alternate jurors “shall replace jurors who become unable to perform or disqualified from performing their duties”, and that if a court replaces a seated juror with an alternate juror after deliberations have begun, the court “shall order the jury to begin deliberations anew.” [Emphasis added.]
The presumption of prejudice as a result of an unauthorized communication, contact, or tampering directly or indirectly by a nonjuror with a juror during trial is not conclusive, but the burden rests heavily upon the State to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188, citing Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); State v. Marchand, 362 So.2d 1090, 1092 (La.1978). The State must show that the outside influence was not | mprejudicial. Id.
In State v. Howard, 573 So.2d 481 (La.1991), the alternate juror participated in the jury’s deliberation, although he did not participate in the vote. The defendant was convicted by a margin of 10-2. In a per curiam opinion, the Supreme Court stated: “The alternate juror’s participation in the jury deliberations (as opposed to the alternate juror’s mere presence in the jury room) constituted an extraneous influence on the jury. Evidence of this participation established a prima facie case of prejudice to the defendant.” The Supreme Court reversed the defendant’s conviction and remanded the case for further proceedings.
In State v. Duplissey, 550 So.2d 590 (La.1989), the Louisiana Court held that an unauthorized communication to the jury by the bailiff was presumed to be prejudicial when it was about a matter pending before the trial court. The bailiff communicated with the jurors concerning the proper manner for the jurors to conduct deliberations where one juror could not read or write. The Supreme Court found that the State did not show that the unauthorized communication was not prejudicial. The conviction and sentence were reversed, and the case was remanded for a new trial.
In the present case, the incorrect juror who was seated was a juror who was excused by the State. When the defendant moved for a mistrial, the State argued that there was no prejudice to the defendant because the juror had been excused by the State and was acceptable to the defense. Defense counsel, however, pointed out that he did not have an opportunity to object to that prospective juror because the State had already excused her.
The record does not indicate how long after the jury retired that it discovered the discrepancy in the verdict slips. The minute entry indicates only that the jury | nretired at 4:30 p.m. and returned with a verdict at 5:20 p.m. It does not reflect that a juror was replaced. The record does not show that the incorrectly seated juror did not participate in the deliberations until the error'was found. The outside influence of the incorrectly seated juror on the jury is presumed to establish a prima facie case of prejudice to the defendant. However, the State may rebut the presumption by showing the defendant was not harmed. Under the circumstances, the State failed to meet its burden of proving that there was no outside influence of the incorrect juror on the jury during deliberations, and that any outside influence was not prejudicial to the defendant.
Further, when the incorrect juror was replaced by the alternate juror, the record does not establish that the trial court ordered the jury to begin the deliberations anew as mandated by La.C.Cr.P. art. 789. The only reference in the trial transcript is *144 the statement by the court to the sheriff that he was to replace Ms. Brown with the alternate juror, and once the alternate juror was in place, “then you can tell the jurors to commence deliberations.”
Accordingly, the defendant’s conviction and sentence are reversed. The ease is remanded for a new trial.

REVERSED AND REMANDED.

PHILIP C. CIACCIO, J. Pro Tem., CONCURS WITH REASONS.