779 So.2d 993 (2001)
STATE of Louisiana
v.
Derrick McKINSEY.
No. 2000-KA-0406.
Court of Appeal of Louisiana, Fourth Circuit.
January 17, 2001.
*994 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, LA, Counsel for Defendant/Appellant.
Court composed of BAGNERIS, TOBIAS, and GORBATY, Judges.
GORBATY, J.
On May 18, 1995, Derrick McKinsey, Marquette Grandpre[1] and Arthur Grandpre were indicted for the first-degree murder of Eric Lewis. On October 27,1995, the cases were severed.[2] Defendant McKinsey's first trial ended in a mistrial on September 24, 1997. On March 23, 1998, the defendant proceeded to trial on the reduced charge of second degree murder, and was found guilty as charged. On September 4, 1998, the trial court sentenced him to life imprisonment without benefit of parole, probation or suspension of sentence.

STATEMENT OF FACT
Officer Darryl Odom testified that on March 14, 1995, he and Officers Guillot, Smith, Thompson and Mungia were assigned *995 to the Fourth District Task Force, investigating narcotics activity in Algiers. At approximately 10:30 p.m. that night, while executing a drug stop at the intersection of General Meyer Avenue and Boyd Street, they heard two instances of rapid gunfire. Officers Thompson and Mungia, in an unmarked Black Ford Taurus, followed by Officers Guillot, Smith and Odom, in a marked police unit, decided to investigate, and drove down General Meyer in the direction of the gunfire. As they approached the intersection of General Meyer and Ernest Street, they observed a young male pedestrian, running on General Meyer away from Kent Street, pursued by the occupants of an Oldsmobile Cutlass. The defendant, who was seated in the front passenger seat of the Oldsmobile, was shooting at the pedestrian. When the Oldsmobile driver, Marquette Grandpre, noticed the approaching police vehicles, he and the defendant began shooting at the officers. Grandpre attempted to elude the police by driving over the General Meyer median, but blew out all four tires. The Oldsmobile continued to roll until it hit a fence. While the Oldsmobile was still rolling, Grandpre jumped out and ran to the rear of the vehicle. Grandpre and the defendant continued to shoot at the officers, who returned fire, wounding Grandpre. As the officers converged on the Oldsmobile, the defendant jumped out and lay in a prone position on the ground. Officer Odom retrieved a loaded Colt .45 from the passenger front seat and a Halloween-type mask, a ski mask and a loaded nine-millimeter Beretta from the back seat. They also confiscated a nine-millimeter handgun from Marquette Grandpre, who was wounded, and called for emergency medical assistance.
Officer Richard Mungia testified corroborating Officer Odom's testimony. He noted that as soon as Grandpre and the defendant noticed the approaching police vehicles, they began firing upon the officers. Officer Mungia assisted in the apprehension of Arthur Grandpre on March 28, 1995, as he was walking in the 2000 block of Whitney Avenue. At the time of his arrest, Arthur Grandpre was armed with a .45 Ruger.
Officer James Ducos of the NOPD crime lab testified that on March 15, 1995, he processed the Oldsmobile Cutlass used in the shooting incident. While he was unable to lift any fingerprints from the vehicle, he did find a nine-millimeter casing under the driver side floor mat.
Officer Kenneth Leary, firearms expert, testified that his duties entail linking bullets and bullet casings to particular firearms, to the exclusion of all other weapons. Officer Leary compared a Glock .40-caliber semiautomatic pistol and Cobray nine millimeter semiautomatic pistol (both found in the victim's possession); a Taurus nine-millimeter semiautomatic pistol, a nine-millimeter Beretta, a Colt .45-caliber semiautomatic pistol, and a Ruger .45-caliber semiautomatic pistol with bullets and bullet casings recovered from 2840 Kent Street (the murder scene) and from the General Meyer and Ernest Street shooting scene and the impounded Oldsmobile Cutlass. He concluded that the Glock .45-caliber semiautomatic pistol fired some of the bullet casings found at the murder scene; the Taurus nine-millimeter semiautomatic pistol fired other casings found at the murder scene as well as casings retrieved from the impounded Oldsmobile; the Beretta nine-millimeter fired casings retrieved from the General Meyer and Ernest Street scene and the murder scene, as well as the bullet recovered from the victim's body; and the Ruger.45-caliber pistol fired casings retrieved from the murder scene.
Dr. Paul McGarry, forensic pathologist with the Orleans Parish Coroner's Office, testified that he performed an autopsy on the body of the victim, Eric Lewis. Dr. McGarry determined that the victim suffered three gunshot woundsthe fatal wound to the left side of his head, another to his right front chest, and another to his right leg. Tests on the victim's blood *996 were negative for alcohol and drugs; however, a urine sample tested positive for the presence of cocaine.
Officer Millard Green, NOPD crime scene technician, testified that his duties involve processing a crime scene for evidence, including testing for fingerprints, and photographing and sketching the scene. He identified photographs he took of the scene depicting bullet holes in the Oldsmobile vehicle, a knit cap, mask and nine-millimeter gun discovered in the Oldsmobile's back seat, spent casings on the floor of the passenger side of the car, and spent casings in various positions outside the Oldsmobile. Officer Green also identified the nine-millimeter Beretta semiautomatic gun retrieved from the rear seat of the Oldsmobile.
Officer Terence Allen, NOPD crime technician, testified that he gathered evidence from, and photographed the murder scene at 2840 Kent Drive on the night of March 14, 1995. He recovered numerous bullet casings and live rounds that night, including four spent .45-caliber bullet casings, two inside the victim's bedroom and two in the driveway, as well as several pieces of rock cocaine, a triple-beam scale and marijuana, also found in the victim's room. Officer Allen recounted that the victim's vehicle, parked in front of his house, sustained a bullet hole, which shattered windshield. He recovered a spent pellet from the front passenger side floorboard of the car.
Homicide Detective Arthur Kaufman testified that he took a typewritten statement from the defendant on the night the murder. He also identified the typewritten statement and the clothing worn by the defendant when he was arrested.
Leonard West, the victim's next door neighbor, testified that he was at the Lewis residence, with Lance Lewis, one of the victim's brothers, at about 7:00 p.m. on March 14, 1995, watching television. The victim's other brothers, Darryl and Gary, were also in the house, as was their sister Dana Lewis. West heard the victim's car drive up, so he (West) opened the door to admit the victim. As West did so, he saw three or four men approaching the house. The victim told him to get back in the house and said "That's themthat's Peanut[3] and them." The victim was scared, and ran into the house. West ran into the hallway, stopped briefly and saw the men kick open the front door. At that point he ran out of the Lewis residence and to his house next door. As he entered his house, he heard gunfire in the Lewis residence. His uncle turned out the lights while he and his grandmother lay on the floor.
Dana Lewis testified that she lived at 2840 Kent Street with her parents and her brothers, Eric, Lance, Gary and Darryl. On the night Eric was killed, her parents were not at home. She was watching television in her room when she heard noises in the front of the house, and decided to investigate. Three masked men were in the front room asking for Eric. They ordered her, Gary and Darryl to lie on the floor. The masked men then took Gary to the wash room. When she and Darryl heard gun shots, they ran into her room, closed the door, and called the police. Darryl stayed with her a few minutes, and then left her room. When he did so, she heard more gunfire. She remained in her room for a brief period after the second burst of gun shots, and then ran out the front door, and across the street to a friend's house. Dana Lewis denied that she and her brothers ever sold or used drugs. She further testified that she never saw the victim with a gun.
Gary Lewis testified that he was asleep in his room the night his brother was killed. He was awakened by noises coming from the living room. When he walked to the front of the house, he encountered four armed men. The defendant and one of the other men took him to the wash room, and told him to kick open *997 the door. He kicked the door twice and then moved to the side. One of the armed men eventually kicked the door open and gunfire erupted. He could see that his brother had been shot, and in the confusion, he elbowed the defendant out of the way and ran out the side door of the house. He gave the police a description of the defendant's clothing, hair cut and build the night of the murder. Later that night, at the police station, he identified the defendant as one of the assailants who entered his house and shot his brother.
Darryl Lewis testified that he and his next door neighbor, Leonard West, were watching television at the Lewis residence the night Eric was murdered. As he and West watched television, he heard his brother's car stop in front of their house. Eric ran into the house saying, "That's Peanut and Megat." Eric ran into his room; Leon West ran out the side door and Darryl ran into the kitchen. Four masked, armed men kicked open the front door, and ordered Darryl, Gary and Dana to lie on the floor. Next, one of the gunmen grabbed Gary and took him to the utility room, telling him to tell Eric to open the door. Darryl heard someone say, "Get him", and then he heard gunshots. After that, Peanut and Megat[4] exited the house through the front door, and Darryl and Dana ran to Dana's room to call the police. As Darryl stood in the hallway peeking outside, Peanut shot at him.
Darryl waited a few minutes and ran to the front of the house. Shots fired from outside entered the house hitting Eric in his leg. Darryl exited the front door, and ran towards a neighbor's fence. As he did so, a blue Oldsmobile backed out of an adjacent driveway, and began chasing him. Peanut, sitting in the front passenger seat, began shooting at him. He ran on Ernest Street toward General Meyer.
Darryl knew Megat from a neighborhood park and recognized the defendant as Peanut. He gave the police clothing and physical descriptions of Peanut and later that night he saw Peanut at police headquarters. Darryl identified the clothing worn by the defendant on the night of the murder. He is sure of Peanut's and Megat's identities because as they left the Lewis residence, they removed their masks and Darryl saw their faces.
Lance Lewis testified that he was bathing when he heard his brother, Eric, enter the house and say, "That's Peanut and Megat." Eric ran to his room, and, two males Lance had never seen before kicked open the front door and pursued Eric to his room. Eric exchanged gunfire with the intruders, who then ran out the front door. When the gunfire stopped, Lance entered Eric's room to see what happened. As he did so, gunshots were fired from outside the house into Eric's room, wounding Eric. Shortly thereafter, Arthur Grandpre entered Eric's room, and shot Eric twice at point blank range. Arthur then ordered Lance to give him Eric's money. After Lance complied, Arthur shot Lance five times, and then left the house.
The defense called Calvin "Chris" Kelly who testified that on the night of March 14, 1995, he was driving down Ernest Street when the defendant flagged him down, and asked for a ride. As the two spoke, they heard "a lot of popping" which sounded like firecrackers. After about a minute, another car pulled up behind Kelly's vehicle and the defendant got into that vehicle and left. Kelly knew the defendant by his nickname "Peanut."
The defendant testified that on the night of March 14, 1995, he was walking on Ernest Street on his way to get ice cream for his son. He stopped Chris Kelly as Kelly drove by, and asked for a ride home. When Kelly told him he was not going that way, the defendant noticed Megat's car turning the corner, so he flagged down Megat, who was driving a blue Oldsmobile, and got into the car. As the defendant got into the car, he heard gunshots, and saw a *998 man running on the sidewalk. The defendant ducked down in the car and when he came up the police were right there. He gave a statement to the police but only after they told him they would charge him with murder unless he named the shooter. Moreover, he stated that the police supplied some of the information found in his statement. He denied that he ever went to the Lewis residence to buy drugs and stated that he had nothing to do with the shooting.

ERRORS PATENT:
A review for errors patent on the face of the record reveals none.

ASSIGNMENT OF ERROR NUMBER 1:
In his first assignment the defendant argues error in the trial judge's denial of his motion for mistrial on grounds that the defendant's brother "threatened" a juror during the course of the trial. Arguing that the contact was prejudicial, he contends that only a mistrial, not merely excusing the juror, will protect his right to a fair trial.
When no mandatory grounds for mistrial are present, La.C.Cr.P. art. 770, mistrial is discretionary upon a showing that "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." La.C.Cr.P. art. 775. Mistrial is a drastic remedy and proper only when misconduct deprives the defendant of any reasonable expectation of a fair trial. State v. Miller, 93-1096 (La. App. 4 Cir. 5/17/94), 637 So.2d 1115 writ denied 94-1584 (La.11/4/94), 644 So.2d 1055. Whether prejudice has resulted lies in the sound discretion of the trial judge. State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078 writs denied 95-2557, 95-2475 (La.2/2/96), 666 So.2d 1087.
The event prompting the defendant's motion for mistrial occurred on the second day of trial, after the court charged the jury, and after court had adjourned for the evening. A man believed to be the defendant's brother approached one of the jurors and said, "Next time, I don't want to see you sleeping in the box." The next morning the court crier informed the trial judge of the "threat" and the judge, through the court crier, removed the "brother" from the courtroom, informing him that he would not be allowed to observe the remainder of the trial. The judge then held an in chambers interview with the juror and all counsel to determine the impact on the juror's ability to deliberate. The juror informed the judge that the incident "really did scare" him and that he would rather not continue to serve. When the juror informed the judge that he told the other jurors of the incident, the defense moved for a mistrial, which the court denied. Out of an abundance of caution, the judge excused the juror, at the request of the defense, and seated an alternate.
Before the reconstituted jury began its deliberations, the judge questioned each juror in open court inquiring whether the incident would affect his or her perception or examination of the evidence. Eleven of the jurors declared that the incident would not affect his or her ability to deliberate. The twelfth juror responded:
THE COURT:
But would it affectI understand you may
JUROR:
Yes ...
THE COURT:
Would it cause you to vote guilty?
JUROR:
I don't know how it would cause right now till I get up therebut I would prefer not.
A defendant's constitutional due process right of fair trial by an impartial jury may be violated if the trial jurors are subjected to influences which cause their verdict to be influenced by circumstances other than the evidence developed at trial. Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); *999 State v. Marchand, 362 So.2d 1090, 1092-1093 (La.1978). The presumption of prejudice as a result of an unauthorized communication, contact, or tampering directly or indirectly by a nonjuror with a juror during trial is not conclusive, but the burden rests heavily upon the State to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. State v. Clark, 97-1757 (La.App. 4 Cir. 4/7/99), 732 So.2d 138 citing State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188, citing Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); State v. Marchand, 362 So.2d 1090, 1092 (La. 1978). The State must show that the outside influence was not prejudicial. Id.
After discussing the incident with the jurors and prior to releasing them to deliberate, the judge cautioned the jurors:
The only thing I do reurge you, ladies and gentlemen, as I know you will, is you must consider the evidence and/or a lack of evidence on the, ah, in this case as to this defendant himself, and anything that his brotherassuming it is his brother, by the wayit may not even have been his brother. It could have been just some observer in this room. That you can't, in any way, hold that against the defendant.
... In other words, even two relatives, one is not responsible for the other's actions, assuming the other man did say something and assuming his intent, just for purposes of this discussion, was something improper.
Following deliberations, the jury returned a verdict of guilty by a 10-2 vote. The court examined the verdict sheet and the written polling slips in open court and noted:
... I would like to point out for the record that the one lady who expressed some concern, Ms. Lambert, answered "no," that was not her vote, so she did not vote to find the defendant guilty as charged, so he [the defendant] cannot claim any prejudice on her part. The other person who voted differently was a man who said it wouldn't have made any difference to him either way. Mr. August answered that that was not his vote.
The defendant cites State v. Copeland, 419 So.2d 899 (La.1982) after remand 530 So.2d 526 (La.4/11/88) cert. den. 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989) rehearing den. 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989) and State v. Duplissey, 550 So.2d 590 (La.1989) in support of his position.
In Copeland the Louisiana Supreme Court overturned the defendant's conviction and sentence for impropriety involving a deputy-bailiff's gifts to jurors, as well as the trial judge's actions in soothing two emotionally distraught jurors, eating, drinking and engaging in social programs with the jury while it was sequestered, and holding judge-juror colloquies outside the presence of the defendant.
In Duplissey the Louisiana Court held that an unauthorized communication to the jury by the bailiff was presumed to be prejudicial when it was about a matter pending before the trial court. The bailiff communicated with the jurors concerning the proper manner for the jurors to conduct deliberations where one juror could not read or write. The Supreme Court found that the State did not show that the unauthorized communication was not prejudicial. The conviction and sentence were reversed, and the case was remanded for a new trial.
This case does not involve improper conduct by the judge or other court personnel, as in Copeland and Duplissey. Although the incident in this case raises the presumption of prejudice, the court took corrective measures. As soon as the judge learned of the improper contact, he had the "brother" removed from the courtroom for the remainder of the trial. Next, the judge interviewed the juror in chambers in the presence of all counsel to ascertain *1000 whether the contact adversely affected the juror's perception of the evidence and/or his ability to deliberate. When the juror apprised the judge he was scared, the judge removed the juror and seated an alternate. The judge then queried the reconstituted jury in open court about their reaction to the contact. Eleven of the jurors stated that they were unaffected by the incident and the last juror said the contact seemed to be a threat but that she could not say how or whether her decision would be affected until she began to deliberate. Finally, the judge admonished the jury that they were not to hold the incident against the defendant.
Considering the court's removal of the "tainted" juror, its questioning each juror as to negative impact of the contact, plus the two votes for acquittal, one from the juror who said the incident would have no bearing on his decision, and the other from the juror with reservations, it appears the State carried its burden to prove that the outside influence did not prejudice the defendant. Hence, the trial judge did not abuse his discretion in denying the defendant's motion for mistrial.

ASSIGNMENT OF ERROR NUMBER 2:
In his second assignment, the defendant complains the trial court erred in denying his motion for new trial based upon his assertion he was denied his sixth amendment right to effective assistance of counsel.
The Louisiana Supreme Court has held that a claim of ineffective assistance of counsel generally is most appropriately addressed through an application for post conviction relief rather than direct appeal, so as to afford the parties an adequate record for review. State v. Truitt, 500 So.2d 355 (La.1987). It is well settled, however, that where the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal, the appellate court may consider the issue in the interests of judicial economy. State v. Peart, 621 So.2d 780 (La.1993).
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. In assessing a claim of ineffectiveness, a two-pronged test is employed. The defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. To show prejudice as required in order to establish ineffective assistance of counsel, the defendant must demonstrate that but for counsel's unprofessional conduct, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Johnson, 99-1053 (La. App. 4 Cir. 6/14/00), 766 So.2d 572.
Effective counsel has been defined to mean "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." State v. Ratcliff, 416 So.2d 528 (La.1982). There exists a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 104 S.Ct. at 2065.
The defendant complains that his trial attorney was ineffective because he was ineligible to practice law at the time of trial for failure to comply with state CLE requirements.
Although the defendant submits that counsel's failure to comply with continuing legal education obligations rendered his assistance ineffective, he cites no case law supporting his position. Nor does the defendant particularize what acts or omissions, occasioned by counsel's noncompliance with professional educational requirements, prejudiced him.
It is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice. State v. *1001 Brogan, 453 So.2d 325 (La.App. 3 Cir. 1984), writ denied 457 So.2d 1200 (La. 1984). Nevertheless, the record indicates that defense counsel's command of the law and facts of the case enabled him to skillfully examine and cross-examine witnesses. Counsel ably represented the defendant through all stages of the case and trial.

CONCLUSION
Accordingly, for the reasons stated herein, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The spelling of Marquette's and Arthur's last name appears interchangeably in the record as "Grandpre" and "Grandprix."
[2] Following a mistrial on March 5, 1997, Arthur and Marquette Grandpre each pleaded guilty to manslaughter on August 28, 1998, and received twenty-five year sentences.
[3] "Peanut" is the defendant's nickname.
[4] Megat is the nickname of one of the co-defendants.