J^GONZALES, Judge.
S.T., a child, was alleged by petition to be delinquent based on the commission of negligent homicide, a violation of La.R.S. 14:32. The child denied the allegation and, following an adjudication hearing, was adjudged delinquent. The child waived presentation prior to disposition, and the court placed the child on supervised probation until he reaches age twenty-one with several special conditions of probation.
The child now appeals his adjudication, urging in three assignments of error that the evidence was insufficient to support his adjudication. In a fourth assignment of error, he contends the judgment of disposition ordered an illegal or excessive fine and imposed an excessive or improper period of probation.[1]
On December 25, 1993, the child accompanied his father and a family friend to the friend’s private hunting camp in the Whiskey Bay area.' Early the next morning, while *1072 situated in his portable deer stand perched high in a tree, the child fired a shot at what he believed to be a deer. Tragically, on going to retrieve the deer, he discovered he had shot and killed another hunter, later identified as Edward Estis, Sr.[2]
ASSIGNMENTS OF ERROR NUMBERS ONE, TWO, AND THREE:
The child contends in these three assignments of error that the court’s decision was contrary to law and the evidence adduced at the hearing. More particularly, the child argues that the evidence was insufficient to sustain a finding of negligent homicide, that the court’s findings of fact as to the degree of negligence do not constitute criminal negligence, and that the state failed to prove the requisite ^element of criminal negligence. These contentions have merit.
FACTS
At the hearing, Detective Patrick Nelson of the Iberville Parish Sheriff’s Office testified he responded to a reported shooting in the Whiskey Bay area. Nelson identified a seven millimeter Ruger that had been taken from the child. After speaking with the child’s father, Nelson arrested the boy and took him and his father to the Maringouin Substation where the boy gave a statement. Nelson confirmed that the incident had occurred in Iberville Parish during daylight. There was no evidence that the child had consumed alcohol or engaged in any “horseplay.”
Captain Scott Haydel of the St. Martin Parish Sheriffs Department testified that his office received the initial call reporting a fatal hunting accident in the Whiskey Bay area. Because it was unclear to him whether the accident had occurred in St. Martin Parish or Iberville Parish, Haydel, who also served as the Chief Medical Investigator for the Coroner’s Office, responded to the call. Haydel described the scene from photographs he had taken of the victim and the child’s deer stand.[3] The victim lay in a path, a small area clear of thickets or briars. The deer stand, located about one hundred twenty yards from the victim, was also free of obstructions, briars, or thickets. However, looking from ground level near the deer stand, Haydel could not see the victim because of the extremely dense woods.[4]
Haydel, too, confirmed that there was no evidence the child consumed alcohol or was engaged in horseplay. This incident was the fourth hunting accident Haydel had investigated. When asked, as an expert, whether the boy should have fired the shot in the dense woods, Haydel was unable to give an opinion because he had not been in the stand at the time.
|4Edward Estis, Jr., the victim’s son, and Jody Meche, another member of the victim’s hunting party, recounted their activities that morning. After ascertaining everyone’s location, the victim set out stating, “[rjight after daylight I’m going to turn the dogs loose” to chase deer towards the hunters. At about 7:30 a.m., they heard the victim “whooping and hollowing [sic] with the dogs” up to about five hundred yards from them. Approximately five to eight minutes after they heard the last of the victim’s whooping, they heard a single shot fired. Each member of the party thought another member had killed a deer. Later sounds of shouting were interpreted as a young boy’s excitement on taking his first deer. A couple of hours later, they observed helicopters circling the area; and, at about 11:15, they abandoned their deer stands to return to their camp. While surmising the helicopters may have indicated a hunting accident somewhere, they remained under the belief that the one shot meant one of them would return to camp with a deer. None of the party went to the area where they guessed the shot had originated; they learned of the tragedy when they returned to *1073 camp where law enforcement officers waited with the victim’s body.
The child, who was sixteen at the time of the incident and eighteen at time of the adjudication hearing, testified he scouted the area for placement of his deer stand the afternoon before the shooting. He selected the location for his deer stand because of deer markings on nearby trees and positioned himself in it about fifteen minutes before daybreak the next day. At about 7:45, he was using a “grunt call” (explained as a sound deer make during rutting season) to attract deer when he heard a noise and some water splashing behind him. He turned and saw a doe, but did not shoot as only bucks were in season. Because he heard similar sounds from the same area, he looked and saw the high neck and rear end of another deer. He put the deer in the scope of his rifle and “grunted” again; observing antlers on the deer, he “shot it”. From his position, he had not heard dogs or yelling and denied shooting blindly at what he had heard.
|5The juvenile testified that he did not leave his position in the tree stand immediately because the designated time for the hunt was nearly finished. Before descending the tree, he put on his orange vest, which he had hung on the tree. On going to get the deer, he discovered he had shot a man. He then returned to his camp in search of his friend, the camp’s owner.
On cross-examination, the prosecutor asked why the child’s earlier statement to the police did not include any mention of antlers. The child explained he was unable to remember everything at the time and did not write the statement.[5] He again insisted, “[w]hen I shot, I saw a buck” with approximately six to eight horns or antlers which were “whitish brown” and repeated, “I saw a deer when I shot.” He testified his rifle was fitted with a telescopic sight and that he had aimed at the front shoulder of the deer when he fired. The child had been exposed to hunting since he was very young and had recently passed a hunting safety course; he has been unable to hunt since the incident.
NEGLIGENT HOMICIDE AND CRIMINAL NEGLIGENCE
The instant petition alleges the child committed negligent homicide by shooting and killing Mr. Edward Estis. La.R.S. 14:32(A) defines negligent homicide as “the killing of a human being by criminal negligence.” Criminal negligence is defined in La.R.S. 14:12 as follows:
Criminal negligence exists when, although neither specific nor general criminal intent •is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
In State v. Garrett, 525 So.2d 1235, 1238 (La.App. 1st Cir.1988), this court referenced the Reporter’s Comment to this statute which states in pertinent part:
[Njegligence is defined as a combination of action or nonaction plus a certain state of mind. Unlike the situation where intent, or adversión [sic] to consequences, is involved, here the state of mind is rather negative, and consists in a disregard of consequences. As a result, the offender falls far below a certain standard of care which is defined in this section in the traditional fashion. Criminal negligence, in 16fact, corresponds to the concept of “gross negligence” in tort law. See Restatement of the Law of Torts (1934) §§ 282-284, 500.
Criminal liability is always predicated not upon mere negligence or carelessness but upon that degree of negligence or carelessness which is denominated “gross” and which constitutes so great a departure from that of a reasonable man that a reasonable man would have realized the risk. Thus, the actor’s conduct reflects a reckless disregard for the safety of another. State v. Garrett, 525 So.2d 1235, 1238-1239 (La.App. 1st Cir.1988), quoting State v. Crawford, 471 So.2d 778, 780 (La.App. 2d Cir.1985). Evidence which only shows ordinary negligence is not sufficient to prove negligent homicide. *1074 State v. Garrett, 525 So.2d at 1239, citing State v. Jones, 298 So.2d 774, 776 (La.1974).
STANDARD OF REVIEW
In a juvenile adjudication proceeding, the state must prove beyond a reasonable doubt that the child committed a delinquent act alleged in the petition. La.Ch.C. art. 883. A delinquent act includes an act committed by a child of 10 years of age or, older which if committed by an adult is designated as an offense under the statutes or ordinances of this state. La.Ch.C. art. 804(3). The burden of proof, beyond a reasonable doubt, is no less severe than the burden of proof required in an adult proceeding. State in Interest of Wilkerson, 542 So.2d 577, 581 (La.App. 1st Cir.1989).
In State in Interest of Giangrosso, 385 So.2d 471, 476 (La.App. 1st Cir.1980), this court observed:
In juvenile proceedings, the scope of review of this court extends to both law and fact. Article 5, Section 10, Constitution of 1974; see State in Interest of Batiste, 367 So.2d 784 (La.1979). We must, therefore, decide if the trial judge was clearly wrong in his determination that the defendants were proven guilty beyond a reasonable doubt.
Writs were granted by the Louisiana Supreme Court and in State in Interest of Giangrosso, 395 So.2d 709, 714 (La.1981), the court applied the standard found in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and affirmed |7this court, concluding that a rational trier of fact could have found, from the evidence adduced at trial, proof of guilt beyond a reasonable doubt.
In State in Interest of Batiste, 367 So.2d 784, 788 (La.1979), the supreme court ruled that the review of juvenile delinquency proceedings extends to both the law and the facts. The court rejected possible inferences which could be drawn from the child’s possession of a bicycle and instead relied upon the unrefuted testimony of witnesses. The court observed:
From this evidence we conclude that the juvenile court was clearly in error in finding beyond a reasonable doubt that Batiste committed unauthorized use of the bicycle.
Batiste, 367 So.2d at 789 (footnote omitted). See also State in the Interest of Racine, 433 So.2d 243 (La.App. 1st Cir.) writ denied, 440 So.2d 151 (La.1983).
The instant record reveals that this juvenile court made inferences based upon facts not in the record. The court recollected its hunting experiences and inferred what “probably” happened because the victim was not the deer the child said he saw. However, in its remarks on adjudicating the child a delinquent, the trial court admitted that it had “no doubt” that the child, who had never been in trouble, “told what he felt was the truth” and that a buck was “what [the child] thought he saw.” The court further observed that “[i]n [the child’s] mind he knew it was a buck coming out, and he shot, unfortunate for the victim and his family.” The court concluded, “I looked at it in all kind of ways, but there was no excuse for it happening.”[6] These findings are the trial court’s findings of fact and do not amount to criminal negligence required to prove negligent homicide.
The child was the only witness who testified as to what he saw and did. Construing his testimony and the other evidence in the record in the light most favorable to the state, the child first saw a doe, which he did not shoot. He then saw a buck which he fixed in his scope and, after seeing antlers and a deer’s head and shoulder, shot at the deer. The only opposition to this otherwise unrefuted Igtestimony is the trial court’s inferences on what may have “actually” happened. Based on its own experiences, the court speculated that the boy must have shot before seeing a deer. The record does not support this conclusion. There was no evidence whatsoever tending to prove the child had not seen a deer before he fired the shot. As previously stated, the court noted the child was truthful in stating he saw a deer. There was no evidence that the child acted in any manner or conducted himself in gross deviation below the standard of care expect *1075 ed of a reasonable hunter in similar circumstances. While the facts certainly portray a tragic hunting accident, the record contains no evidence, including the trial court’s factual findings, to support a finding of the element of criminal negligence required in a case of negligent homicide. We therefore conclude that the juvenile court was clearly in error in adjudicating the child a delinquent and finding him guilty of a negligent homicide.[7]
DECREE
For the foregoing reasons, the judgment of the juvenile court adjudicating the child a delinquent and its disposition is REVERSED, and the petition against him is hereby DISMISSED.

. The court ordered the child to forfeit his rifle to the Sheriff’s Office; to attend monthly Hunter Education Program classes where he was to relate the incident, including the victim's name and family, at each meeting until he was twenty-one; to forfeit his hunting privileges for five years; to pay "a maximum fine” (amount unspecified) to the victim’s family; and to apologize, in the presence of the court, to the victim’s family. (The apology was extended before the court adjourned.)

. Counsels' opening and closing statements refer to a stipulation that the victim was killed with a single shot fired by the child; that stipulation is not part of the record.

. The photographs were not included with the record; however, comments by counsel and the court reference a stipulation that the victim was dressed in camouflage clothing without any hunter's orange garment.

.It was unclear whether he had viewed the scene from the stand itself.

. The record does not contain a copy of the statement from the child.

. The court did not refer to any standard of proof.

. In light of this conclusion, we need not address the fourth assignment of error regarding the disposition.