6 So.3d 141 (2009)
STATE of Louisiana
v.
Jake DESOTO.
No. 2007-K-1804.
Supreme Court of Louisiana.
March 17, 2009.
*142 James D. Caldwell, Attorney General, Charles Riddle, District Attorney, Norris J. Greenhouse, Assistant District Attorney, for applicant.
Jonathan T. Gaspard, for respondent.
JOHNSON, Justice.[1]
Jake Desoto (Desoto) shot and killed his friend, Kain Roy, (Roy) in a hunting accident. He was charged by bill of indictment with negligent homicide in violation of LSA-R.S 14:32. Following trial on the merits, an Avoyelles Parish jury returned a unanimous verdict of guilty as charged. The trial court sentenced Desoto to serve five years without hard labor, with two years of the sentence suspended, and also ordered the defendant placed on supervised probation upon release from incarceration. A motion to reconsider sentence was denied. A Third Circuit majority affirmed the conviction on appeal. However, on rehearing, a split three-judge panel reversed the conviction, vacated the sentence, and entered a judgment of acquittal.[2] We granted certiorari in this case to determine whether the appellate court, on rehearing, erred in determining that the evidence did not support a finding of criminal negligence, and whether the court substituted its own findings of fact in place of those of the trier of fact, the jury.[3]
*143 For reasons that follow, we reverse the ruling of the court of appeal, reinstate the jury verdict and sentence imposed by the trial court, and remand to the trial court for consideration of the sentencing error of failure to impose the probation supervision fee mandated by La.C.Cr.P. art. 895.1(C).

FACTS
On November 20, 2004, opening day of deer rifle season, Desoto, and his friend, Roy, set out from the hunting camp of Jerold Edward (Eddie) Knoll on an all terrain vehicle (four-wheeler) between 2:30 and 3:00 p.m. to hunt deer in the northeast corner of the Knoll property and the adjacent Beauregard property. Both of the men had working cellular phones with them. According to the report of Tom Konvicka, (a consulting meteorologist), introduced at trial, the day was characterized by rain, cloudy skies and temperatures hovered in the upper 50's to middle 60's. Rainfall amounts in Avoyelles were generally between 0.50 and 1.50 inches. Fog was also observed. Sunrise occurred at 6:42 a.m. and sunset occurred at 5:09 p.m. While en route to the hunting grounds, the four-wheeler ran out of gas and Desoto and Roy proceeded on foot toward a slough.[4] The two men then separated to hunt individually from the hunting stands erected on the property. Roy went to hunt at a ladder stand called the "Eiffel Tower," and Desoto headed over to a climbing free stand across the Beauregard field, east of the Eiffel Tower.
According to Desoto, he arrived at the climbing tree stand between 3:00 and 3:15 p.m., but stayed there for only about 20 minutes before leaving the stand, because it was windy and he had no jacket. He walked the tree line to the corner of the field to check the corn he had previously put out to attract deer. Desoto then walked toward the Eiffel Tower and was approximately 32 yards to the southwest of that stand.
Desoto claimed he phoned Roy, at 5:19 p.m., although the cellular phone records indicated that it was actually Roy who phoned Desoto. According to Desoto, Roy told him that he thought he saw a deer walking on "this side of the slough" and heading toward the field in the direction of the climbing tree stand and told Desoto to "stay in the field." One minute later, at 5:20 p.m., cellular phone records show that Desoto received a call from his girlfriend, Candace Marcotte, which lasted for approximately 9½ minutes. According to Marcotte, the call ended abruptly when Desoto hung up on her after saying "I see a deer gotta go." Moments later, Desoto fired one shot that struck Roy in the back of his neck.[5]
Desoto stated that he waited for about five minutes, then walked in the direction of the shot, when he discovered Roy, face down, in about six to eight inches of water in the slough. He turned Roy's body over, *144 so that his face was out of the water, and tried to drag Roy's body out of the water, but only managed a few feet. Desoto stated that he dropped his gun and ran to the camp for help, but he did not attempt to call for help using his cell phone. No one was at the camp when he arrived. He then located a four-wheeler at the camp, and drove it toward the direction where he thought the other hunters were located. He encountered Blake Knoll and Deputy Lee Clay, a Deputy Police Officer, and told them that "Kain is dead." The three men went back to the camp, where they were met by Eddie Knoll. While at the camp, Deputy Clay placed the first call for assistance. The four men then went to the area where Desoto indicated he had left Roy's body. According to Desoto, Eddie Knoll checked the body for a pulse, confirmed that Roy was dead, and they all returned to the camp. Because it was now dark, they left one of the four wheelers at the scene with the lights on to indicate where the body was located.
Detective Schaub of the Avoyelles Parish Sheriffs Department located the shell casing determined to have been shot by Desoto. Detective Schaub measured a distance of 246 feet from the location of that cartridge to the location of Roy's head. The location from which Desoto fired his gun was calculated to be 97 feet from the Eiffel Tower. While the gun Desoto used, a Remington 30-06 semi-automatic rifle mounted with a Redfield 3x9 scope, was ultimately retrieved from the place where Desoto dropped it, the power setting on the gun's scope was never recorded and it could not be verified as to what setting defendant had the scope placed on at the time of the shooting.
The evidence presented at trial indicated that neither Desoto nor Roy had worn the required "Hunter's Orange" clothing that day and neither were found to have been intoxicated. Desoto stated that he observed Roy's white t-shirt and thought it was the underbelly of a deer, but photographs of the crime scene, showed that Roy was not wearing a white t-shirt, but was instead wearing a grey athletic tee shirt with "MSH" embossed on it.

PROCEDURAL HISTORY
Desoto was indicted by a grand jury for negligent homicide in violation of LSA-R.S. 14:32 on March 21, 2005. On February 2, 2006, ah Avoyelles Parish jury unanimously found Desoto guilty as charged.
On appeal, the Third Circuit affirmed Desoto's conviction, but remanded the case to the trial court to correct the sentencing error of failure to impose the probation supervision fee mandated by La.C.Cr.P. art. 895.1(C). Judge Pickett wrote the majority opinion, and concluded that the evidence supported the jury's verdict. She noted that a rational fact-finder could interpret Desoto's ambiguous statement, that he had seen his friend "walking out into the field," to mean that defendant "actually saw Roy enter the field and later fired his gun at either Roy or a deer." State v. Desoto, 06-1115, at 27, 968 So.2d at 161. "If the defendant saw Roy in the field," Judge Pickett found that, "his act of firing the gun, even at a deer, would have been a gross deviation below the standard of care expected of a reasonably careful person under like circumstances." Id. Judge Pickett further opined that rational jurors could have found from the evidence that "defendant shot without clearly identifying his target," an act that "also would have been a gross deviation below the standard of care expected of a reasonably careful person under like circumstances." Id. Judge Pickett concluded that viewing the evidence, including Desoto's own video taped statement, in the light most favorable to the prosecution, a rational trier of *145 fact could have found proof beyond a reasonable doubt that Desoto was guilty of negligent homicide. Id.
Chief Judge Thibodeaux dissented, finding that Desoto was hunting when it was dark, "cloudy rainy, and foggy with coffee weed in the field where the incident occurred." Id., 968 So.2d at 172. The dissent labeled the shooting an "unfortunate accident," finding nothing to prove that defendant knew his good friend was hunting in front of him. Id.
On May 23, 2007, defendant filed a motion for rehearing, arguing that the Third Circuit's majority decision conflicted with State in the Interest of S.T., 95-2187 (La. App. 1 Cir. 6/28/96), 677 So.2d 1071, and that Louisiana's status as a "Sportsman's Paradise" was at stake when conflicting cases are "at odds ... as to what constitutes criminal negligence in a hunting accident scenario where a hunter is engaged in a lawful activity with no reckless conduct involved." Counsel for Desoto sharply disagreed with Judge Pickett that reasonable jurors could have found from his statement that Desoto had actually seen his friend, as opposed to what he believed was a deer, walk out into the open field.
On rehearing, in a split decision penned by the previous lone dissenter, Chief Judge Thibodeaux, the Third Circuit reversed its earlier decision, vacated Desoto's conviction and sentence, and entered a judgment of acquittal.[6] The Third Circuit aligned itself with the First Circuit in reaching the same decision as the appellate court in State in the Interest of S.T., supra, finding that no evidence of criminal negligence was demonstrated in another case in which a hunting accident resulted in a homicide after the shooter claimed that he "believed he shot at a deer or what he thought was a deer." Desoto, 06-1115 at 1, 968 So.2d at 172-73.
In her concurrence, Judge Cooks opined that by hunting when it was getting dark and firing his gun when he was not absolutely sure what was in his sight,
[d]efendant violated a rule of hunting [which] does not necessarily equate to criminal negligence. The State's position that a hunter must always be certain what he sees in his sight before shooting would mean we could never have a hunting "accident," but simply de facto acts of criminal negligence. To the relief of many, including our esteemed vice president, this is not the intent of the statute.
Id., 06-1115 at 2, 968 So.2d at 174.
Judge Pickett dissented from the Third Circuit's decision on rehearing, citing this Court's ruling in State v. Ware, 06-1703 (La.6/29/07), 959 So.2d 459, in which we reiterated the standard of review in evaluating sufficiency claims:
[A] reviewing court may impinge on the trier of fact's discretion "only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305 (La.1988).
Ware, 06-1703 at 8, 959 So.2d at 463-64.
In Judge Pickett's view, the majority's decision to reverse on rehearing "failed to accord due deference to the rational credibility choices made by the jury" and in fact "substituted its appreciation of the evidence for that of the fact finder." Judge Pickett further disagreed:
I note, for example, that the writing judge states as fact that the defendant did not see Roy enter the field. There was, in fact, testimony from the defendant that could have caused the jury to conclude that the defendant did see Roy *146 enter the field. This court's substitution of its conclusions regarding the evidence for the conclusions of the jury is exactly what the Supreme Court in Ware reminds us is prohibited.
Desoto, 06-1115 at 2, 968 So.2d at 175.
Judge Pickett reiterated her view expressed on original hearing that rational jurors could have determined from defendant's own statement that he shot knowing his friend had moved out from his safe perch in the "Eiffel Tower" deer stand into the same field as the deer he had spotted, and knowing as a subjective matter that he should not fire because he could not clearly identify his target. Desoto, 06-1115 at 1-2, 968 So.2d at 174-75.

LAW AND DISCUSSION
Where there is evidence presented by the prosecution to justify the jury's conclusion that a defendant is guilty of criminal negligence, a court cannot reverse the conviction for failure of proof. State v. Minor, 241 La. 339, 129 So.2d 10 (La.1961). In reviewing the sufficiency of the evidence to support a conviction for negligent homicide, an appellate court in Louisiana is controlled by the standard of review adjudged by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979),
"[T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984).
LSA-R.S. 14:32 Negligent Homicide provides:
A. Negligent homicide is the killing of a human being by criminal negligence. B. The violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence. C. (1) Except as provided for in Paragraph (2) of this Subsection, whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than five thousand dollars, or both.
LSA-R.S. 14:12 defines criminal negligence as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such a disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. LSA-R.S. 14:12; State v. Pardon, 97-0248, p. 9 (La.App. 5 Cir. 10/15/97), 703 So.2d 50, 59.[7]
*147 The provisions of former La. Cr.C. arts. 29 to 32 (See, now LSA-R.S. 14:32) dealing with homicide indicated the legislature's intent that negligent homicide should constitute an offense of a lesser grade than murder or manslaughter and be included in the latter two as a lesser offense. State v. Stanford, 204 La. 439, 15 So.2d 817 (La.1943). The offense of negligent homicide is not an intentional crime and intent is not an element of negligent homicide. State v. Guillot, 277 So.2d 146 (La.1973).
Jurisprudence shows that the common element in negligent homicide cases involving firearms is a finding that a defendant acted in an unreasonably dangerous or unsafe manner at the time of the discharge of his weapon. Evidence of negligent homicide was found to be sufficient in State v. McFerson, 583 So.2d 516, (La.App. 3rd Cir.) writ denied, 588 So.2d 113 (La. 1991), where it was determined that the defendant acted below the standard of care expected to be maintained by reasonably careful persons under similar circumstances when he brought a loaded gun into a bar, pulled the gun out of his pants pocket, and the gun discharged killing an innocent victim.
Similarly, in State v. Barberousse, 458 So.2d 569, (La.App. 3rd Cir.1984) aff'd, 480 So.2d 273 (La.1985), a defendant was found criminally negligent when he fatally shot his sister when he pulled out a loaded .38 caliber revolver, cocked it and pointed it at another person, supposedly to frighten that person. The gun discharged, with the bullet striking defendant's sister in the chest and fatally wounding her. The courts have also found evidence sufficient in a case wherein the shooter was purportedly under duress when he fired his weapon. In State v. Parker, 431 So.2d 114 (La.App. 1st Cir.), writ denied 435 So.2d 433 (La.1983), the defendant was found guilty of negligent homicide even though the evidence indicated that he may have been harassed and fearful at the time of the shooting. Evidence indicated that the defendant shot through his door without first determining who was outside and while knowing that other members of his residence were not in the home, but expected to return to the residence.
In considering the sufficiency of evidence in cases involving negligent homicide it is useful to examine cases involving other mechanisms of injury. For instance, in comparing cases involving firearms and motor vehicles, the common thread is the use of a dangerous instrumentality at the time of the criminally negligent act(s). In State v. Mears, 445 So.2d 167, (La.App. 3rd Cir.), writ denied, 446 So.2d 1231 (La. 1983), evidence was sufficient to sustain a conviction for negligent homicide when it was determined that the defendant was driving in the dark with no headlights on when the vehicle he was driving struck and killed a pedestrian. In State v. Martin, 539 So.2d 1235 (La.1989), the conduct of a defendant driving at a high rate of speed, on a busy highway, following another vehicle very closely, was deemed a gross deviation below the standard of care and constituted gross negligence for purposes of the negligent homicide statute. Likewise, in a case involving a driver whose blood alcohol level was only slightly above the presumptive level for intoxication, evidence was sufficient to support a finding of negligent homicide when it was concluded that he was driving at a high rate of speed, on a foggy night, while attempting to pass three cars in a no-passing zone.
In State v. Barberousse, supra, though the victim's blood alcohol level was high enough to kill her, notwithstanding *148 her drunkenness, her death resulted from negligent homicide from a gunshot accidently fired into her chest. By analogy, in the case at bar, poor weather conditions, coupled with the actions of Desoto and the victim do not release Desoto from criminal liability. A victim's own negligence does not negate a finding of criminal negligence. The fact that both Desoto and Roy were not wearing hunter's orange clothing and were both walking on the hunting grounds when they were supposed to be in the hunting stands does not exculpate Desoto from being criminally negligent. Moreover, the fact that Desoto knew Roy was not wearing hunter's orange, and thought that Roy was wearing a white shirt, was reason for him not to shoot at the mere sight of a flash of white color.
Here, the State was charged with the burden of showing that Desoto's actions, which resulted in Roy's death, amounted to a disregard of the interests of others, and were a gross deviation from the standard of care expected to be exercised by a reasonably careful hunter. To this end, the state established that Desoto was trained in hunting safety, and was therefore not ignorant of the standard of care expected of a reasonable hunter, and that Desoto knowingly acted in an unreasonably dangerous, and unsafe manner, when he discharged his weapon. Desoto knew the rules of hunting and demonstrated such in his recorded statement when he said that he told Roy, "... I told him good luck and told him the rules of not shooting a doe and I was the only one that could shoot a doe and he could shoot a six pointer or better."[8]
At trial, the state introduced the testimony of Sergeant Russell Dauzat, of the Louisiana Wildlife and Fisheries Department, a thirty-year veteran of that agency, who testified that a prospective hunter must complete training classes to obtain a Louisiana hunting license and safety certificate.[9] Sergeant Dauzat also testified as to the standard of care for deer hunters. He testified that his investigation revealed that both Desoto and Roy possessed current, valid, hunting licenses and safety certificates and that to obtain their licences, they both had completed the required hunting classes. He testified that he assists in teaching the hunter education classes and that the first lesson taught is the prevention of accidents. One of the principle rules of safety in hunting is to "identify your target, make sure you know what you're shooting at and what's beyond that target." The Louisiana Hunter Education Manual (LHEM), used in these classes, and introduced into evidence at trial, states that one of the "Ten Commandments of Shooting Safety" is "Be sure of your target and what is beyond it." Furthermore, the LHEM instructs that, "A safe hunter never shoots at a flash of color, a sound, or a shape in a tree."
The State established through Sergeant Dauzat that it would be dangerous for a hunter not to wear hunter's orange, and that it would be highly dangerous for Desoto, having been purportedly told by Roy that he saw a deer, and to "stay where he was," to get out of his hunting stand, and walk to the area where Roy told him the deer was coming. The State also established through Sergeant Dauzat that it *149 would be highly dangerous for a hunter to get out of his hunting stand, and walk within 97 feet of a fellow hunter, with a rifle, without telling the other hunter what he was doing.
Candice Marcotte, Desoto's former girlfriend, testified that on the day of the shooting she spoke with Desoto, for approximately 9½ minutes, and that Desoto abruptly hung up on her, ending the conversation at 5:20 p.m. by saying "I see a deer gotta go." She testified that she and Desoto were having a disagreement, and that during their conversation, Desoto did not mention that he had just spoken with Roy.
Perhaps the most damning evidence against Desoto was his video taped statement that the State presented to establish his actions as criminally negligent. On November 22, 2004, two days after the shooting, Desoto voluntarily gave a video taped interview to the police in which he described the events of the day of the shooting. During that interview, he expressed that he hesitated when taking the shot that killed Roy because he was unsure that what he was shooting at, was in fact, a deer. His statement also brought into question whether he actually saw Roy in the field when he took the shot at what he believed was a deer. The video taped statement was the only testimony of Desoto presented at trial. During that interview the following colloquy occurred between Detective Schaub and Desoto:
Jake: So I stayed and um. I stayed for I'm not sure, um, a little while, I mean, twenty thirty minutes you know and um I seen him walk him walk out.
[Detective] Dan [Schaub]: You seen.
Jake: I seen, I seen, I seen, he had a shirt on, Kain had a camoflage (sic) shirt on with a white shirt and um. I thought it was the underneath of a deer and I seen the deer, I seen the deer go-back.
Dan: Ok you seen it with your eyes.
Jake: With my own eyes, not scope, gun down to my side, I seen it. And um I told myself, I told myself, I said I'm not gonna shoot right now, I said, because it might be, it's just not right, it's not right. I don't know, I don't know what it is. I told myself that. Sure enough he turned broad, he turned broadside and I don't know if Kain was ducking down, I don't know what he was doing.
Dan: Ok. I mean just relax, Jake it's ok. Alright, you said something very important, ok. You said that you had seen Kain and he was wearing camoflage (sic) with a white shirt, where did you see him, was it by his stand, was it in the slough.
Jake: He was walking out into the field.
Jake: He must have been looking at me, he had to have been because his white was facing towards me and a little while later he turned and I guess maybe he seen the deer and he was bent down, but I when I seen him I knew I knew that it wasn't a person or nothing like that cause he was bent over you know. Dan: ... Are you looking through the scope now are you still doing this visually with you[r] own two eyes.
Jake: Looking through, I mean I'm looking with my own two eyes. As soon as he turns broad, broadside.
Dan: Ok. Did you have a picture in your scope of what you shot at.
Jake: I saw. I just seen the white....
In addition to Detective Schaub, Desoto's father, Mike Desoto, was present at the video taped interview. Desoto's father *150 was also allowed to question Desoto during the interview. Despite clearly stating that he saw the victim walking in the field wearing a camouflage shirt when he took aim at the deer, Desoto, in the colloquy with his father, denied seeing Roy when he saw, what he thought, was a deer.
The video taped statement presents two competing scenarios: One in which Desoto first testifies that he saw Roy walking on the hunting ground, when he also saw a deer, and another where he later testified that he never saw Roy on the ground near the time of the shooting. Even granting that Desoto's statements that he saw Roy "walking out into the field," and "1 seen, he had a shirt on, Kain had a camouflage [sic] shirt on with a white shirt ...," may have been critically ambiguous, and may have meant simply that what he believed at the time was a deer in the field, was, in retrospect, actually his friend, there was no ambiguity in the counsel Desoto gave himself just before firing: "I told myself, I told myself, I said I'm not gonna shoot right now, I said, because it might be, it's just not right, it's not right. I don't know, I don't know what it is." There is no escaping the fact that to pull the trigger of a high-powered hunting rifle, capable of accurately hitting a target a football field away, without being sure of his target, was reckless disregard for the safety of others and created an unreasonable risk of harm to others.
The jury, having viewed Desoto's video taped statement, was in the best position to observe Desoto's demeanor in concert with his testimony, and make a credibility determination. The jury was also presented with the testimony of Eddie Knoll who testified that at approximately 5:25 p.m. he heard a shot coming from the direction of where Desoto and Roy were supposed to be hunting. (Recall that sunset occurred at 5:09 p.m.) Within five minutes of the shooting, he saw a deer clearly in his unobstructed view from his position of only 14 feet above the ground, (a distance much closer than Desoto was to Roy when he shot him). Eddie Knoll choose not to take a shot at the deer, because even though he was viewing it through the scope of his rifle, he could not determine if the deer was a mature buck, the only deer he was legally allowed to shoot. The actions of Eddie Knoll in carefully attempting to discern the exact subject in his sights, stood in stark contrast against Desoto's actions of shooting where he thought he saw an appearance of something white.
Additionally, numerous photographs of the crime scene were entered into evidence at trial, including aerial photographs showing the layout of the hunting grounds where Roy was killed, and other photographs depicting the scene as viewed from the approximate position of Desoto to Roy. The jury was thus presented with credible descriptions and examples that were approximate and/or similar to the conditions under which Desoto made the decision to take the shot that killed Roy.
The Defendant's reliance on State in Interest of S.T., supra, is misplaced. The two cases are easily distinguished, because unlike the case at bar, State in Interest of S.T., involved a minor whose un-refuted testimony was that he saw a buck, which he fixed in his scope, and after seeing the antlers and deer's head and shoulder, he shot at the deer. This is in stark contrast to Desoto, who never testified that he actually saw a deer prior to discharging his weapon, but rather, that he saw a flash of white color and thinking that it might be the underbelly of a deer, shot at it.
The defense also argued in brief that Desoto believed Roy was positioned in the Eiffel Tower when he spotted what he thought was a deer, and had Roy been in the Eiffel Tower, he would have been well *151 out of harm's way when Desoto fired the shot. However, we only have Desoto's statement as to what actually happened and what Desoto was thinking at the time of the shooting.
At no time did Desoto testify that he believed Roy was in the hunting stand when he shot his rifle. Roy called Desoto and purportedly told Desoto that he saw a deer and to "stay in the field," Desoto did not thereafter, call Roy to ascertain his location, or notify Roy that he was no longer in his hunting stand, but instead, Desoto walked into the open field. Desoto's actions, by shooting his rifle, even though he could not identify his target, constituted a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.
On rehearing, the appellate court framed the issue as "whether the Defendant believed he shot at a deer." Desoto, 06-1115, at 1, 968 So.2d at 172. However, as Judge Pickett emphasized in her original opinion, the actual issue on appeal was whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt that the offender's conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. From this perspective, the appellate court erroneously substituted its own appreciation of the evidence for that of the fact finder and failed to accord due deference to the rational credibility choices made by the jury.
The state's case is even stronger if, as Judge Pickett opined below, rational jurors could find from defendant's statement that what he actually saw in the field was his friend, as well as a deer, and that he, nonetheless, pulled the trigger. Though an accident, Desoto's actions were a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. Therefore we find that the Third Circuit erred in not giving due deference to the credibility determinations made by the trier of fact, and in failing to do so, erred by reversing Desoto's conviction on rehearing.

CONCLUSION
Accordingly, this Court reverses the decision of the Third Circuit on rehearing, reinstates the jury's conviction for negligent homicide and the concomitant sentence previously imposed by the trial court in accordance with this opinion, and remands to the trial court for consideration of the sentencing error of failure to impose the probation supervision fee mandated by La.C.Cr.P. art. 895.1(C).
REVERSED AND REMANDED.
LANDRIEU, J. dissents with reasons.
LANDRIEU, Associate Justice (Ad Hoc), dissents.
The tragic consequence of an act of simple negligence does not magnify that act of simple negligence into an act of gross negligence.
The defendant made a serious mistake. After the victim told defendant that he saw a deer, he apparently left his position of safety and went to the spot where he thought the deer had been sighted. Believing the victim was the deer that had been described, defendant shot his best friend.
The defendant was negligent and the result was tragic. However, there is no evidence in the record of any action whereby a reasonable juror could conclude beyond a reasonable doubt that defendant grossly deviated below the standard of care expected to be maintained by a reasonably *152 careful man under the circumstances.
NOTES
[1] Retired Judge Moon Landrieu sitting ad hoc for Knoll, J., recused.
[2] State v. Desoto, 06-1115 (La.App.3 Cir. 3/14/07), 968 So.2d 146, on reh'g (8/15/07).
[3] State v. Desoto, 07-1804 (La.9/19/08), 992 So.2d 965.
[4] "Slough: Noun. A depression or hollow, usually filled with mud or mire, also slew; A stagnant swamp, bog, or pond, especially as part of a bayou, inlet or backwater." Merriam-Webster's College Dictionary, 2003.
[5] According to the autopsy report of the victim introduced at trial. Roy died from "exsanguination (loss of blood) and drowning due to falling into and inhalation of water due to gunshot wound of the posterobasal right neck." The gunshot wound caused a large gaping laceration of the victim's posterior basal neck, limited to the soft tissues, without cervical, honey or cerebral injury, and without injury to the carotid artery or the jugular vein although small branches of the carotid artery and jugular vein were transected. The direction of fire was from back to front, left to right, without deviation upward or downward.
[6] State v. Desoto, 06-1115 (La.App. 3 Cir. 8/15/07), 968 So.2d at p. 172-73 (Cooks, J., concurs with reasons).
[7] The Reporter's Comment to LSA-R.S. 14:12 states that criminal negligence "corresponds to the concept of `gross negligence' in tort law." See Restatement of the Law of Torts (1934) §§ 282-284. 500.

The State is required to show more than a mere deviation from the standard of ordinary care to establish proof of criminal negligence. State v. Jones, 298 So.2d 774 (La. 1974). The negligent homicide statute proscribes conduct that goes beyond carelessness, mistake, error in judgment or omission of duty. State v. Fenner, 94-1498 (La. App. 4 Cir. 11/16/95, 664 So.2d 1315). 664 So.2d 1315[. writ denied. 95-3001 (La.4/29/96), 672 So.2d 679]. It is more than the mere failure to do something which a reasonable and prudent man would do, or the mere doing of something which a reasonable and prudent man might not do, on cool reflection, after considering the degree of harm likely to follow. Further, the "consequences" alone do not determine the criminal culpability of the actor. State v. Bowie, 95-0795. p. 2 (La.App. 3 Cir. 11/13/96), 684 So.2d 68, 70. writ granted on other grounds, 96-2987 (La.1/31/97), 687 So.2d 369.
[8] Although shooting a doe (female deer) is generally prohibited, Desoto would have been permitted to shoot a doe because he had never before shot a deer and it was the first day of hunting season.
[9] "All persons born after September 1, 1969, must show proof of satisfactorily completing a Hunter Safety course approved by LDWF to purchase a basic Hunting License ..." LA Hunting Seasons and Wildlife Management Area Regulations (2004-2005).